# NATIONAL LABOR RELATIONS BOARD *v.* HEALTH CARE & RETIREMENT CORPORATION OF AMERICA

No. 92–1964.   Argued February 22, 1994—Decided May 23, 1994

572

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined.  GINSBURG, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined, *post*, p. 584.

*Michael R. Dreeben* argued the cause for petitioner. With him on the briefs were *Solicitor General Days, Deputy Solicitor General Wallace, Jerry M. Hunter, Nicholas E. Karatinos, Norton J. Come, Linda Sher, John Emad Arbab,* and *Daniel Silverman.*

*Maureen E. Mahoney* argued the cause for respondent. With her on the brief were *Cary R. Cooper, Margaret J. Lockhart,* and *R. Jeffrey Bixler.**

JUSTICE KENNEDY delivered the opinion of the Court.

The National Labor Relations Act (Act) affords employees the rights to organize and to engage in collective bargaining free from employer interference.  The Act does not grant

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* and for the American Nurses Association by *Barbara J. Sapin* and *Woody N. Peterson.*

Briefs of *amici curiae* urging affirmance were filed for the American Health Care Association by *Andrew A. Peterson, Thomas V. Walsh,* and *Patrick L. Vaccaro;* for the Council on Labor Law Equality by *Gerard C. Smetana* and *Michael E. Avakian;* and for U. S. Home Care Corp. by *William H. DuRoss III.*

those rights to supervisory employees, however, so the statutory definition of supervisor becomes essential in determining which employees are covered by the Act. In this case, we decide the narrow question whether the National Labor Relations Board's (Board's) test for determining if a nurse is a supervisor is consistent with the statutory definition.

I

Congress enacted the National Labor Relations Act in 1935. Act of July 5, 1935, ch. 372, 49 Stat. 449. In the early years of its operation, the Act did not exempt supervisory employees from its coverage; as a result, supervisory employees could organize as part of bargaining units and negotiate with the employer. Employers complained that this produced an imbalance between labor and management, but in 1947 this Court refused to carve out a supervisory employee exception from the Act's broad coverage. The Court stated that "it is for Congress, not for us, to create exceptions or qualifications at odds with [the Act's] plain terms." *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485, 490 (1947). Later that year, Congress did just that, amending the statute so that the term "'employee' . . . shall not include . . . any individual employed as a supervisor." 61 Stat. 137–138, codified at 29 U. S. C. § 152(3). Congress defined a supervisor as:

> "[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 61 Stat. 138, codified at 29 U. S. C. § 152(11).

As the Board has stated, the statute requires the resolution of three questions; and each must be answered in

the affirmative if an employee is to be deemed a supervisor. First, does the employee have authority to engage in 1 of the 12 listed activities? Second, does the exercise of that authority require "the use of independent judgment"? Third, does the employee hold the authority "in the interest of the employer"? *Northcrest Nursing Home,* 313 N. L. R. B. 491, 493 (1993). This case concerns only the third question, and our decision turns upon the proper interpretation of the statutory phrase "in the interest of the employer."

In cases involving nurses, the Board admits that it has interpreted the statutory phrase in a unique manner. Tr. of Oral Arg. 52 (Board: "[t]he Board has not applied a theory that's phrased in the same terms to other categories of professionals"). The Board has held that "a nurse's direction of less-skilled employees, in the exercise of professional judgment incidental to the treatment of patients, is not authority exercised 'in the interest of the employer.'" Pet. for Cert. 15. As stated in reviewing its position on this issue in its recent decision in *Northcrest Nursing Home, supra,* at 491–492, the Board believes that its special interpretation of "in the interest of the employer" in cases involving nurses is necessary because professional employees (including registered nurses) are not excluded from coverage under the Act. See 29 U. S. C. § 152(12). Respondent counters that "[t]here is simply no basis in the language of the statute to conclude that direction given to aides in the interest of nursing home residents, pursuant to professional norms, is not 'in the interest of the employer.'" Brief for Respondent 30.

In this case, the Board's General Counsel issued a complaint alleging that respondent, the owner and operator of the Heartland Nursing Home in Urbana, Ohio, had committed unfair labor practices in disciplining four licensed practical nurses. At Heartland, the Director of Nursing has overall responsibility for the nursing department. There is also an Assistant Director of Nursing, 9 to 11 staff nurses

(including both registered nurses and the four licensed practical nurses involved in this case), and 50 to 55 nurses' aides. The staff nurses are the senior ranking employees on duty after 5 p.m. during the week and at all times on weekends—approximately 75% of the time. The staff nurses have responsibility to ensure adequate staffing; to make daily work assignments; to monitor the aides' work to ensure proper performance; to counsel and discipline aides; to resolve aides' problems and grievances; to evaluate aides' performances; and to report to management. In light of these varied activities, respondent contended, among other things, that the four nurses involved in this case were supervisors, and so not protected under the Act. The Administrative Law Judge (ALJ) disagreed, concluding that the nurses were not supervisors. The ALJ stated that the nurses' supervisory work did not "equate to responsibly . . . direct[ing] the aides *in the interest of the employer*," noting that "the nurses' focus is on the well-being of the residents rather than of the employer." 306 N. L. R. B. 68, 70 (1992) (internal quotation marks omitted) (emphasis added). The Board stated only that "[t]he judge found, and we agree, that the Respondent's staff nurses are employees within the meaning of the Act." 306 N. L. R. B. 63, 63, n. 1 (1992).

The United States Court of Appeals for the Sixth Circuit reversed. 987 F. 2d 1256 (1993). The Court of Appeals had decided in earlier cases that the Board's test for determining the supervisory status of nurses was inconsistent with the statute. See *Beverly California Corp.* v. *NLRB*, 970 F. 2d 1548 (1992); *NLRB* v. *Beacon Light Christian Nursing Home*, 825 F. 2d 1076 (1987). In *Beverly*, for example, the court had stated that "the notion that direction given to subordinate personnel to ensure that the employer's nursing home customers receive 'quality care' somehow fails to qualify as direction given 'in the interest of the employer' makes very little sense to us." 970 F. 2d, at 1552. Addressing the instant case, the court followed *Beverly* and again held the

Board's interpretation inconsistent with the statute. 987 F. 2d, at 1260. The court further stated that "it is up to Congress to carve out an exception for the health care field, including nurses, should Congress not wish for such nurses to be considered supervisors." *Id.*, at 1261. The court "remind[ed] the Board that it is the courts, and not the Board, who bear the final responsibility for interpreting the law." *Id.*, at 1260. After concluding that the Board's test was inconsistent with the statute, the court found that the four licensed practical nurses involved in this case were supervisors. *Id.*, at 1260–1261.

We granted certiorari, 510 U. S. 810 (1993), to resolve the conflict in the Courts of Appeals over the validity of the Board's rule. See, *e. g., Waverly-Cedar Falls Health Care Center, Inc.* v. *NLRB*, 933 F. 2d 626 (CA8 1991); *NLRB* v. *Res-Care, Inc.*, 705 F. 2d 1461 (CA7 1983); *Misericordia Hospital Medical Center* v. *NLRB*, 623 F. 2d 808 (CA2 1980).

## II

We must decide whether the Board's test for determining if nurses are supervisors is rational and consistent with the Act. See *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 42 (1987). We agree with the Court of Appeals that it is not.

## A

The Board's interpretation, that a nurse's supervisory activity is not exercised in the interest of the employer if it is incidental to the treatment of patients, is similar to an approach the Board took, and we rejected, in *NLRB* v. *Yeshiva Univ.*, 444 U. S. 672 (1980). There, we had to determine whether faculty members at Yeshiva were "managerial employees." Managerial employees are those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer." *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 288 (1974) (internal quotation marks omitted). Like supervisory employees, manage-

rial employees are excluded from the Act's coverage. *Id.*, at 283 ("so clearly outside the Act that no specific exclusionary provision was thought necessary"). The Board in *Yeshiva* argued that the faculty members were not managerial, contending that faculty authority was "exercised in the faculty's own interest rather than in the interest of the university." 444 U. S., at 685. To support its position, the Board placed much reliance on the faculty members' independent professional role in designing the curriculum and in discharging their professional obligations to the students. We found the Board's reasoning unpersuasive:

> "In arguing that a faculty member exercising independent judgment acts primarily in his own interest and therefore does not represent the interest of his employer, the Board assumes that the professional interests of the faculty and the interests of the institution are distinct, separable entities with which a faculty member could not simultaneously be aligned. The Court of Appeals found no justification for this distinction, and we perceive none. In fact, the faculty's professional interests—as applied to governance at a university like Yeshiva—cannot be separated from those of the institution.
>
> ". . . The 'business' of a university is education." *Id.*, at 688.

The Board's reasoning fares no better here than it did in *Yeshiva*. As in *Yeshiva*, the Board has created a false dichotomy—in this case, a dichotomy between acts taken in connection with patient care and acts taken in the interest of the employer. That dichotomy makes no sense. Patient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer. See *Beverly California, supra*, at 1553. We thus see no basis for the Board's blanket assertion that supervisory au-

thority exercised in connection with patient care is somehow not in the interest of the employer.

Our conclusion is supported by the case that gave impetus to the statutory provision now before us. In *Packard Motor*, we considered the phrase "in the interest of an employer" contained in the definition of "employer" in the original 1935 Act. We stated that "[e]very employee, from the very fact of employment in the master's business, is required to act in his interest." 330 U. S., at 488. We rejected the argument of the dissenters who, like the Board in this case, advanced the proposition that the phrase covered only "those who acted for management . . . in formulating [and] executing its labor policies." *Id.*, at 496 (Douglas, J., dissenting); cf. Reply Brief for Petitioner 4 (filed July 23, 1993) (nurses are supervisors when, "in addition to performing their professional duties and responsibilities, they also possess the authority to affect the job status or pay of employees working under them"). Consistent with the ordinary meaning of the phrase, the Court in *Packard Motor* determined that acts within the scope of employment or on the authorized business of the employer are "in the interest of the employer." 330 U. S., at 488–489. There is no indication that Congress intended any different meaning when it included the phrase in the statutory definition of supervisor later in 1947. To be sure, Congress altered the result of *Packard Motor*, but it did not change the meaning of the phrase "in the interest of the employer" when doing so. And we of course have rejected the argument that a statute altering the result reached by a judicial decision necessarily changes the meaning of the language interpreted in that decision. See *Public Employees Retirement System of Ohio* v. *Betts*, 492 U. S. 158, 168 (1989).

Not only is the Board's test inconsistent with *Yeshiva*, *Packard Motor*, and the ordinary meaning of the phrase "in the interest of the employer," it also renders portions of the statutory definition in § 2(11) meaningless. Under § 2(11),

an employee who in the course of employment uses independent judgment to engage in 1 of the 12 listed activities, including responsible direction of other employees, is a supervisor. Under the Board's test, however, a nurse who in the course of employment uses independent judgment to engage in responsible direction of other employees is not a supervisor. Only a nurse who in the course of employment uses independent judgment to engage in one of the activities related to another employee's job status or pay can qualify as a supervisor under the Board's test.  See Reply Brief for Petitioner 4 (filed July 23, 1993) (nurses are supervisors when they affect "job status or pay of employees working under them").  The Board provides no plausible justification, however, for reading the responsible direction portion of §2(11) out of the statute in nurse cases, and we can perceive none.

The Board defends its test by arguing that phrases in §2(11) such as "independent judgment" and "responsibly to direct" are ambiguous, so the Board needs to be given ample room to apply them to different categories of employees. That is no doubt true, but it is irrelevant in this particular case because interpretation of those phrases is not the underpinning of the Board's test.  The Board instead has placed exclusive reliance on the "in the interest of the employer" language in §2(11).  With respect to that particular phrase, we find no ambiguity supporting the Board's position.  It should go without saying, moreover, that ambiguity in one portion of a statute does not give the Board license to distort other provisions of the statute.  Yet that is what the Board seeks us to sanction in this case.

The interpretation of the "in the interest of the employer" language mandated by our precedents and by the ordinary meaning of the phrase does not render the phrase meaningless in the statutory definition.  The language ensures, for example, that union stewards who adjust grievances are not considered supervisory employees and deprived of the Act's protections.  But the language cannot support the Board's

argument that supervision of the care of patients is not in the interest of the employer. The welfare of the patient, after·all, is no less the object and concern of the employer than it is of the nurses. And the statutory dichotomy the Board has created is no more justified in the health care field than it would be in any other business where supervisory duties are a necessary incident to the production of goods or the provision of services.

B

Because the Board's test is inconsistent with both the statutory language and this Court's precedents, the Board seeks to shift ground, putting forth a series of nonstatutory arguments. None of them persuades us that we can ignore the statutory language and our case law.

The Board first contends that we should defer to its test because, according to the Board, granting organizational rights to nurses whose supervisory authority concerns patient care does not threaten the conflicting loyalties that the supervisor exception was designed to avoid. Brief for Petitioner 25. We rejected the same argument in *Yeshiva* where the Board contended that there was "no danger of divided loyalty and no need for the managerial exclusion" for the Yeshiva faculty members. 444 U. S., at 684. And we must reject that reasoning again here. The Act is to be enforced according to its own terms, not by creating legal categories inconsistent with its meaning, as the Board has done in nurse cases. Whether the Board proceeds through adjudication or rulemaking, the statute must control the Board's decision, not the other way around. See *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S. 790, 811 (1974); cf. *Packard Motor, supra*, at 493 (rejecting resort to policy and legislative history in interpreting meaning of the phrase "in the interest of the employer"). Even on the assumption, moreover, that the statute permits consideration of the potential for divided loyalties so that a unique interpretation is permitted in the health care field, we do not share the

Board's confidence that there is no danger of divided loyalty here. Nursing home owners may want to implement policies to ensure that patients receive the best possible care despite potential adverse reaction from employees working under the nurses' direction. If so, the statute gives nursing home owners the ability to insist on the undivided loyalty of its nurses notwithstanding the Board's impression that there is no danger of divided loyalty.

The Board also argues that "[t]he statutory criterion of having authority 'in the interest of the employer' . . . must not be read so broadly that it overrides Congress's intention to accord the protections of the Act to professional employees." Brief for Petitioner 26; see 29 U. S. C. § 152(12). The Act does not distinguish professional employees from other employees for purposes of the definition of supervisor in § 2(11). The supervisor exclusion applies to "any individual" meeting the statutory requirements, not to "any non-professional employee." In addition, the Board relied on the same argument in *Yeshiva*, but to no avail. The Board argued that "the managerial exclusion cannot be applied in a straightforward fashion to professional employees because those employees often appear to be exercising managerial authority when they are merely performing routine job duties." 444 U. S., at 683–684. Holding to the contrary, we said that the Board could not support a statutory distinction between the university's interest and the managerial interest being exercised on its behalf. There is no reason for a different result here. To be sure, as recognized in *Yeshiva*, there may be "some tension between the Act's exclusion of [supervisory and] managerial employees and its inclusion of professionals," but we find no authority for "suggesting that that tension can be resolved" by distorting the statutory language in the manner proposed by the Board. *Id.*, at 686.

Finally, as a reason for us to defer to its conclusion, the Board cites legislative history of the 1974 amendments to other sections of the Act. Those amendments did not alter

the test for supervisory status in the health care field, yet the Board points to a statement in a Committee Report expressing apparent approval of the Board's then-current application of its supervisory employee test to nurses. S. Rep. No. 93–766, p. 6 (1974); see *Yeshiva, supra,* at 690, n. 30. As an initial matter, it is far from clear that the Board in fact had a consistent test for nurses before 1974. Compare *Avon Convalescent Center, Inc.,* 200 N. L. R. B. 702 (1972), with *Doctors' Hospital of Modesto, Inc.,* 183 N. L. R. B. 950 (1970). In any event, the isolated statement in the 1974 Committee Report does not represent an authoritative interpretation of the phrase "in the interest of the employer," which was enacted by Congress in 1947. "[I]t is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means." *Pierce* v. *Underwood,* 487 U. S. 552, 566 (1988). Indeed, in *American Hospital Assn.* v. *NLRB,* 499 U. S. 606 (1991), the petitioner pointed to isolated statements from the same 1974 Senate Report cited here and argued that they revealed Congress' intent with respect to a provision of the original 1935 Act. We dismissed the argument, stating that such statements do not have "the force of law, for the Constitution is quite explicit about the procedure that Congress must follow in legislating." *Id.,* at 616; see also *Betts,* 492 U. S., at 168. In this case as well, we must reject the Board's reliance on the 1974 Committee Report. If Congress wishes to enact the policies of the Board, it can do so without indirection. See generally *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A., ante,* at 185–188.

## III

An examination of the professional's duties (or in this case the duties of the four nonprofessional nurses) to determine whether 1 or more of the 12 listed activities is performed in a manner that makes the employee a supervisor is, of course, part of the Board's routine and proper adjudicative function.

In cases involving nurses, that inquiry no doubt could lead the Board in some cases to conclude that supervisory status has not been demonstrated. The Board has not sought to sustain its decision on that basis here, however. It has chosen instead to rely on an industrywide interpretation of the phrase "in the interest of the employer" that contravenes precedents of this Court and has no relation to the ordinary meaning of that language.

To be sure, in applying § 2(11) in other industries, the Board on occasion reaches results reflecting a distinction between authority arising from professional knowledge and authority encompassing front-line management prerogatives. It is important to emphasize, however, that in almost all of those cases (unlike in cases involving nurses) the Board's decisions did not result from manipulation of the statutory phrase "in the interest of the employer," but instead from a finding that the employee in question had not met the other requirements for supervisory status under the Act, such as the requirement that the employee exercise one of the listed activities in a nonroutine manner. See *supra*, at 573 (listing other requirements for supervisory status). That may explain why the Board did not cite in its submissions to this Court a single case outside the health care field approving the interpretation of "in the interest of the employer" the Board uses in nurse cases. That the Board sometimes finds a professional employee not to be a supervisor when applying other elements of the statutory definition of § 2(11) cannot be shoehorned into the conclusion that the Board can rely on its strained interpretation of the phrase "in the interest of the employer" in all nurse cases. If we accepted the Board's position in this case, moreover, nothing would prevent the Board from applying this interpretation of "in the interest of the employer" to all professional employees.

We note further that our decision casts no doubt on Board or court decisions interpreting parts of § 2(11) other than the specific phrase "in the interest of the employer." Because

the Board's interpretation of "in the interest of the employer" is for the most part confined to nurse cases, our decision will have almost no effect outside that context. Any parade of horribles about the meaning of this decision for employees in other industries is thus quite misplaced; indeed, the Board does not make that argument.

In sum, the Board's test for determining the supervisory status of nurses is inconsistent with the statute and our precedents. The Board did not petition this Court to uphold its order in this case under any other theory. See Brief for Respondent 21, n. 25. If the case presented the question whether these nurses were supervisors under the proper test, we would have given a lengthy exposition and analysis of the facts in the record. But as we have indicated, the Board made and defended its decision by relying on the particular test it has applied to nurses. Our conclusion that the Court of Appeals was correct to find the Board's test inconsistent with the statute therefore suffices to resolve the case. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE GINSBURG, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE SOUTER join, dissenting.

The National Labor Relations Act, 29 U. S. C. § 151 *et seq.*, guarantees organizational, representational, and bargaining rights to "employees," but expressly excludes "supervisors" from that protected class. See §§ 157, 152(3). Section 2(11) of the Act defines the term "supervisor" by, first, enumerating 12 supervisory actions (including, for example, hiring, firing, disciplining, assigning, and "responsibly" directing) and, further, prescribing that "any individual" who has "authority, in the interest of the employer," to perform or "effectively to recommend" any of these actions is a supervisor, provided that the exercise of such authority requires "independent judgment" rather than "merely routine or clerical" action. § 152(11).

In contrast to its exclusion of supervisors, the Act expressly includes "professional employees" within its protections.[1] Section 2(12) defines "professional employee" as one whose work is "predominantly intellectual and varied in character," involves "the consistent exercise of discretion and judgment in its performance," produces a result that "cannot be standardized in relation to a given period of time," and requires knowledge "in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital." 29 U. S. C. § 152(12)(a).[2]

The categories "supervisor" and "professional" necessarily overlap. Individuals within the overlap zone—those who are both "supervisor" and "professional"—are excluded from the Act's coverage. For that reason, the scope accorded the Act's term "supervisor" determines the extent to which professionals are covered. If the term "supervisor" is construed broadly, to reach everyone with any authority to use "independent judgment" to assign and "responsibly . . . direct" the work of other employees, then most professionals would be supervisors, for most have *some* authority to assign and direct others' work. If the term "supervisor" is understood that broadly, however, Congress' inclusion of professionals within the Act's protections would effectively be nullified.

The separation of "supervisors," excluded from the Act's compass, from "professionals," sheltered by the Act, is a task Congress committed to the National Labor Relations Board (NLRB or Board) in the first instance. The Board's attempt

---

[1] See § 152(12) (defining "professional employee"); § 159(b) (limiting National Labor Relations Board's discretion to place professional and nonprofessional employees in the same bargaining unit).

[2] The definition of "professional employee" further includes persons who have completed the required course of study and are "performing related work under the supervision of a professional person" in order finally to qualify as a professional. § 152(12)(b).

to carry out that charge is the matter under examination in this case.

The controversy before the Court involves the employment status of certain licensed practical nurses at Heartland Nursing Home in Urbana, Ohio. Unlike registered nurses, who are professional employees, licensed practical nurses are considered "technical" employees. The Board, however, applies the same test of supervisory status to licensed practical nurses as it does to registered nurses where, as in this case, the practical nurses have the same duties as registered nurses. See 306 N. L. R. B. 68, 69, n. 5 (1992) (duties of staff nurses at Heartland, the evidence showed, "were virtually the same whether the nurses were [licensed practical nurses] or [registered nurses]"); *Ohio Masonic Home, Inc.*, 295 N. L. R. B. 390, 394–395, and n. 1 (1989); cf. *NLRB* v. *Res-Care, Inc.*, 705 F. 2d 1461, 1466 (CA7 1983) (licensed practical nurses "are, if not full-fledged professionals, at least sub-professionals").

Through case-by-case adjudication, the Board has sought to distinguish individuals exercising the level of control that truly places them in the ranks of management, from highly skilled employees, whether professional or technical, who perform, incidentally to their skilled work, a limited supervisory role. I am persuaded that the Board's approach is rational and consistent with the Act. I would therefore uphold the administrative determination, affirmed by the Board, that Heartland's practical nurses are protected employees.

I

As originally enacted in 1935, the National Labor Relations Act (Act), 29 U. S. C. § 151 *et seq.*, did not expressly exclude supervisors from the class of "employees" entitled to the Act's protections. See §§ 7, 2(3), 49 Stat. 452, 450. The Board decided in *Packard Motor Co.*, 61 N. L. R. B. 4 (1945), that in the absence of an express exclusion, supervisors must be held within the Act's coverage. This Court agreed,

stating that the language of the Act allowed no other interpretation. *Packard Motor Car Co.* v. *NLRB*, 330 U. S. 485 (1947).

Congress responded by excluding supervisors in the Labor-Management Relations Act, 1947.[3] The Senate Committee Report noted that the Senate's definition of "supervisor"[4] had been framed with a view to assuring that "the employees . . . excluded from the coverage of the act [would] be truly supervisory." S. Rep. No. 105, 80th Cong., 1st Sess., 19 (1947) (hereinafter Senate Report), Legislative History 425; see also H. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947), Legislative History 539 ("supervisor" limited "to individuals generally regarded as foremen and persons of like or higher rank"). As the Senate Report explains:

> "[T]he committee has not been unmindful of the fact that certain employees with minor supervisory duties have problems which may justify their inclusion [within the protections of the Act]. It has therefore distinguished between straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as the right to hire or fire, discipline, or make

---

[3] Section 2(11) of the Act defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U. S. C. § 152(11). Section 2(3) provides, in part, that "[t]he term 'employee' . . . shall not include . . . any individual employed as a supervisor." § 152(3).

[4] The House and Senate bills defined the term "supervisor" differently; the Conference Committee adopted the Senate version. See H. Conf. Rep. No. 510, 80th Cong., 1st Sess., 35 (1947), reprinted in 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, p. 539 (1948) (hereinafter Legislative History).

effective recommendations with respect to such action." Senate Report, at 4, Legislative History 410.

The purpose of § 2(11)'s definition of "supervisor," then, was to limit the term's scope to "the front line of management," the "foremen" who owed management "undivided loyalty," *id.*, at 5, Legislative History 411, as distinguished from workers with "minor supervisory duties."

At the very time that Congress excluded supervisors from the Act's protection, it added a definition of "professional employees." See 29 U. S. C. § 152(12).[5] The inclusion of that definition, together with an amendment to § 9(b) of the Act limiting the placement of professionals and nonprofessionals in the same bargaining unit, see n. 1, *supra,* confirm that Congress did not intend its exclusion of supervisors largely to eliminate coverage of professional employees.

Nevertheless, because most professionals supervise to some extent, the Act's inclusion of professionals is in tension with its exclusion of supervisors. The Act defines a supervisor as "any individual" with authority to use "independent judgment" "to . . . assign . . . other employees, or responsibly

---

[5] "The term 'professional employee' means—

"(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or

"(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a)."

to direct them." Professionals, by definition, exercise independent judgment, see 29 U. S. C. § 152(12), and most professionals have authority to assign tasks to other employees and "responsibly to direct" their work. See *NLRB* v. *Res-Care, Inc.*, 705 F. 2d 1461, 1465 (CA7 1983) (Posner, J.) ("[M]ost professionals have some supervisory responsibilities in the sense of directing another's work—the lawyer his secretary, the teacher his teacher's aide, the doctor his nurses, the registered nurse her nurse's aide, and so on."). If possession of such authority and the exercise of independent judgment were sufficient to classify an individual as a statutory "supervisor," then few professionals would receive the Act's protections, contrary to Congress' express intention categorically to include "professional employees."

## II

### A

The NLRB has recognized and endeavored to cope with the tension between the Act's exclusion of supervisors and its inclusion of professional employees. See, *e. g.*, *Northcrest Nursing Home*, 313 N. L. R. B. 491 (1993). To harmonize the two prescriptions, the Board has properly focused on the policies that motivated Congress to exclude supervisors. Accounting for the exclusion of supervisors, the Act's drafters emphasized that employers must have the "undivided loyalty" of those persons, "traditionally regarded as part of management," on whom they have bestowed "such genuine management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action." See Senate Report, at 3–4, Legislative History 409–410 (quoted in *Northcrest Nursing Home*, 313 N. L. R. B., at 491. Accordingly, the NLRB classifies as supervisors individuals who use independent judgment in the exercise of managerial or disciplinary authority over other employees. *Id.*, at 493–494. But because professional employees often are not in management's "front line," the "undi-

vided loyalty" concern is somewhat less urgent for this class of workers. The Board has therefore determined that the exercise of professional judgment "to assign and direct other employees in the interest of providing high quality and efficient service" does not, by itself, "confer supervisory status." *Id.*, at 494.

The NLRB has essayed this exposition of its inquiry:

> "In determining the existence of supervisory status, the Board must first determine whether the individual possesses any of the 12 indicia of supervisory authority and, if so, whether the exercise of that authority entails 'independent judgment' or is 'merely routine.' If the individual independently exercises supervisory authority, the Board must then determine if that authority is exercised 'in the interest of the employer.'" *Id.*, at 493.

As applied to the health-care field, the Board has reasoned that to fit the formulation "in the interest of the employer," the nurse's superintendence of others must reflect key managerial authority, and not simply control attributable to the nurse's "professional or technical status," direction incidental to "sound patient care." *Id.*, at 493, 496. Cf. *Children's Habilitation Center, Inc.* v. *NLRB*, 887 F. 2d 130, 134 (CA7 1989) (Posner, J.) (authority does not fit within the "interest of the employer" category if it is "exercised in accordance with professional rather than business norms," *i. e.*, in accordance with "professional standards rather than . . . the company's profit-maximizing objectives").

## B

The NLRB's "patient care analysis" is not a rudderless rule for nurses, but an application of the approach the Board has pursued in other contexts. The Board has employed the distinction between authority arising from professional knowledge, on one hand, and authority en-

compassing front-line management prerogatives, on the other, to resolve cases concerning the supervisory status of, for example, doctors,[6] faculty members,[7] pharmacists,[8] librarians,[9] social workers,[10] lawyers,[11] television station

---

[6] See *The Door*, 297 N. L. R. B. 601, 602, n. 7 (1990) ("routine direction of employees based on a higher level of skill or experience is not evidence of supervisory status").

[7] See *Detroit College of Business*, 296 N. L. R. B. 318, 320 (1989) (professional employees "'[f]requently require the ancillary services of nonprofessional employees in order to carry out their professional, not supervisory, responsibilities,'" but "it was not Congress' intention to exclude them from the Act 'by the rote application of the statute without any reference to its purpose or the individual's place on the labor-management spectrum'"), quoting *New York Univ.*, 221 N. L. R. B. 1148, 1156 (1975).

[8] See *Sav-On Drugs, Inc.*, 243 N. L. R. B. 859, 862 (1979) ("pharmacy managers do exercise discretion and judgment" in assigning and directing clerks, but "such exercise . . . falls clearly within the ambit of their professional responsibilities, and does not constitute the exercise of supervisory authority in the interest of the Employer").

[9] See *Marymount College of Virginia*, 280 N. L. R. B. 486, 489 (1986) (rejecting classification of catalog librarian as a statutory supervisor, although librarian's authority over technician's work included "encouraging productivity, reviewing work for typographical errors, and providing answers to the technician's questions based on the catalog librarian's professional knowledge").

[10] See *Youth Guidance Center*, 263 N. L. R. B. 1330, 1335, and n. 23 (1982) ("senior supervising social workers" and "supervising social workers" not statutory supervisors; "[t]he Board has carefully and consistently avoided applying the statutory definition of 'supervisor' to professionals who give direction to other employees in the exercise of professional judgment which is incidental to the professional's treatment of patients and thus is not the exercise of supervisory authority in the interest of the employer").

[11] See *Neighborhood Legal Services, Inc.*, 236 N. L. R. B. 1269, 1273 (1978): "[T]o the extent that the [attorneys in question] train, assign, or direct work of legal assistants and paralegals for whom they are professionally responsible, we do not find the exercise of such authority to confer supervisory status within the meaning of Section 2(11) of the Act, but rather to be an incident of their professional responsibilities as attorneys and thereby as officers of the court." The Board continued: "[W]e are careful to avoid applying the definition of 'supervisor' to professionals who direct other employees in the exercise of their professional judgment,

directors,[12] and, as this Court has noted, architects and engineers. See *NLRB* v. *Yeshiva Univ.*, 444 U. S. 672, 690, n. 30 (1980) (citing cases). Indicating approval of the NLRB's general approach to the Act's coverage of professionals, the Court stated in *Yeshiva:*

> "The Board has recognized that employees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty. Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management. We think these decisions accurately capture the intent of Congress . . . ." *Id.*, at 690 (footnote omitted).

Notably, in determining whether, in a concrete case, nurses are supervisors within the meaning of the Act, the Board has drawn particularly upon its decisions in "leadperson" controversies. "Leadpersons" include skilled employees who do not qualify as statutory "professionals," but, like professional employees, have some authority to assign or direct other workers. In leadperson cases, as in cases involving professionals, the NLRB has distinguished between authority that derives from superior skill or experience, and authority that "flows from management and tends to identify or associate a worker with management." *South-*

---

which direction is incidental to the practice of their profession, and thus is not the exercise of supervisory authority in the interest of the Employer." *Id.*, at 1273, n. 9.

[12] See *Golden-West Broadcasters-KTLA*, 215 N. L. R. B. 760, 762, n. 4 (1974): "[A]n employee with special expertise or training who directs or instructs another in the proper performance of his work for which the former is professionally responsible is not thereby rendered a supervisor. . . . This is so even when the more senior or more expert employee exercises some independent discretion where, as here, such discretion is based upon special competence or upon specific articulated employer policies."

*ern Bleacher & Print Works, Inc.*, 115 N. L. R. B. 787, 791 (1956), enforced, 257 F. 2d 235, 239 (CA4 1958); cf. *Northcrest Nursing Home*, 313 N. L. R. B., at 494–495 (drawing the analogy between leadpersons and charge nurses in hospitals and nursing homes). Differentiating the role of front-line managers from that of leadperson, the Board has placed some nurses, because of the level of their authority, in the supervisor category, while ranking others, as in this case, in a professional (or technical), but not supervisor, class. See cases cited in *id.*, at 498, n. 36.

### III

Following the pattern revealed in NLRB decisions, the Administrative Law Judge (ALJ), affirmed by the Board, determined that the four licensed practical nurses in this case were not supervisors. The ALJ closely examined the organization and operation of nursing care at Heartland and found the nurses' direction of aides "closely akin to the kind of directing done by leadmen or straw bosses, persons . . . Congress plainly considered to be 'employees.'" 306 N. L. R. B., at 70. Backing up this finding, the ALJ pointed out that, although the nurses "g[a]ve orders (of certain kinds) to the aides, and the aides follow[ed] those orders," *id.*, at 72, the nurses "spen[t] only a small fraction of their time exercising that authority," *id.*, at 69. Essentially, the nurses labored "to ensure that the needs of the residents [were] met," and to that end, they "check[ed] for changes in the health of the residents, administer[ed] medicine, . . . receive[d] status reports from the nurses they relieve[d], and g[a]ve [such] reports to aides coming on duty and to the nurses' reliefs," pinch-hit for aides in "bathing, feeding or dressing residents," and "handle[d] incoming telephone calls from physicians and from relatives of residents who want[ed] information about a resident's condition." *Ibid.*

The ALJ noted, too, that "when setting up the aide-resident assignments," the nurses "followed old patterns"; indeed, "the nurses routinely let the aides decide among

themselves which aide was to cover which residents." *Id.*, at 70. The administrator and the director of nursing were "always on call" and nurses in fact called them at their homes "when non-routine matters ar[o]se." *Id.*, at 72.

Throughout the hearing, the ALJ reported, he gained "the impression that Heartland's administrator believed that the nurses' views about anything other than hands-on care of the residents were not worth considering." *Ibid.* "[T]he actions of Heartland's administrator," the ALJ concluded, repeatedly and unmistakably demonstrated that "to [Heartland's] management, Heartland's nurses were just hired hands." *Ibid.* I see no tenable basis for rejecting the ALJ's ultimate ruling that the nurses' jobs did not entail genuine, front-line supervisory status of the kind that would exclude them from the Act's protection.

## IV

### A

The phrase ultimately limiting the § 2(11) classification "supervisor" is, as the Court recognizes, "in the interest of the employer." To give that phrase meaning as a discrete and potent limitation, the Board has construed it, in diverse contexts, to convey more than the obligation all employees have to further the employer's business interests, indeed more than the authority to assign and direct other employees pursuant to relevant professional standards. See, *e. g.*, *Northcrest Nursing Home*, 313 N. L. R. B. 491 (1993) (nurses); *Youth Guidance Center*, 263 N. L. R. B. 1330, 1335, and n. 23 (1982) (social workers); *Sav-On Drugs, Inc.*, 243 N. L. R. B. 859, 862 (1979) (pharmacists); *Neighborhood Legal Services, Inc.*, 236 N. L. R. B. 1269, 1273, and n. 9 (1978) (attorneys).[13] It is a defining task of management to formu-

---

[13] The Board, as the decisions cited in text demonstrate, takes no unique approach in cases involving nurses. See also cases cited, *supra*, at 591–592, nn. 6–7, 9, 12. Nor, contrary to the Court's report, see *ante*, at 574, did counsel for the NLRB admit to deviant interpretation of the phrase,

late and execute labor policies for the shop; correspondingly, the persons charged with superintending management policy regarding labor are the "supervisors" who, in the Board's view, act "in the interest of the employer."

Maintaining professional standards of course serves the interest of an enterprise, and the NLRB is hardly blind to that obvious point. See *Northcrest Nursing Home,* 313 N. L. R. B., at 494 (interest of employer and employees not likely to diverge on charge nurse decisions concerning methods of attending to patients' needs). But "the interest of the employer" may well tug against that of employees, on matters such as "hiring, firing, discharging, and fixing pay"; "in the interest of the employer," persons with authority regarding "things of that sort" are properly ranked "supervisor." [14]

---

"interest of the employer," in nurses' cases. When asked whether "[i]t is uniquely nurses" who do not act "in the interest of the employer" when attending to "the needs of the customer," counsel replied, "No, it is not uniquely nurses." Tr. of Oral Arg. 52. While counsel continued, when pressed, to say that "[t]he Board has not applied a theory that's phrased in the same terms to other categories of professionals," *ibid.,* counsel appears to have been referring to the precisely particularized, "patient care" version of the inquiry. Counsel added: "What the Board has done is draw an analogy between . . . what nurses do and what other minor supervisory employees do. . . . [T]he Board's rule in this case is fully consistent with the traditional rule that it has applied." *Id.,* at 53.

[14] See 92 Cong. Rec. 5930 (1946), containing the statement of Representative Case on a forerunner of present § 2(11), included as part of the Case bill, passed by Congress, but vetoed by President Truman in 1946. Representative Case stated of the bill's provision, nearly identical to the present § 2(11): " 'In the interest of the employer'—that is the key phrase to keep in mind. . . . All that the section on supervisory employees does is to say that if 'in the interest of the employer,' [a] person has a primary responsibility in hiring, firing, discharging, and fixing pay, and things of that sort, then at the bargaining table he shall not sit on the side of the employee, but shall sit on the side of the employer. . . . No man can serve two masters. If you are negotiating a contract, a lawyer does not represent both clients. That is all that is involved here."

The Court does not deny that the phrase "in the interest of the employer" was intended to limit, not to expand, the category "supervisor."[15] Yet the reading the Court gives to the phrase allows it to provide only one example of workers who would not fit the description: "The language ensures . . . that union stewards who adjust grievances are not considered supervisory employees and deprived of the Act's protections." *Ante,* at 579. Section 2(11)'s expression, "in the interest of the employer," however, modifies all 12 of the listed supervisory activities, not just the adjustment of grievances. Tellingly, the single example the Court gives, "union stewards who adjust grievances," rests on the very distinction the Board has endeavored to apply in all quarters of the workplace: one between "management" interests peculiar to the employer, and the sometimes conflicting interests of employees.[16]

---

[15] The Court does maintain, however, that Congress meant to embrace our statement in *Packard Motor Car Co. v. NLRB,* 330 U. S. 485 (1947), that "[e]very employee, from the very fact of employment in the master's business, is required to act in his interest." *Id.,* at 488; see *ante,* at 578. But Congress' purpose, in enacting §2(11), was to overturn the Court's holding in *Packard Motor Car.* Thus it is more likely that Congress was taken by Justice Douglas' dissenting view that "acting in the interest of the employer" fits employees who act for management "not only in formulating but also in executing its labor policies." 330 U. S., at 496. Moreover, Congress had included the phrase, "in the interest of the employer," the year before *Packard Motor Car,* in a predecessor bill to the Labor-Management Relations Act that defined the term "supervisor" almost identically. See n. 14, *supra.* Finally, the Court acknowledged in *Packard Motor Car* that the phrase "interest of the employer" may also be read more narrowly, in contradistinction to employees' interests in improving their compensation and working conditions. 330 U. S., at 489, 490. *Packard Motor Car,* then, does not support the conclusion that the words, "interest of the employer," have a plain meaning inconsistent with the interpretation the Board has given them in supervisor cases.

[16] The Court suggests that the Board has "rea[d] the responsible direction portion of §2(11) out of the statute in nurse cases." *Ante,* at 579 (referring to the words "responsibly to direct" in §2(11)'s list of supervisory activities). The author of the amendment that inserted those words

Congress adopted the supervisor exclusion to bind to management those persons "vested with . . . genuine management prerogatives," Senate Report, at 4, Legislative History 410, *i. e.*, those with the authority and duty to act specifically "in the interest of the employer" on matters as to which management and labor interests may divide. The Board has been faithful to the task Congress gave it, I believe, in distinguishing the employer's hallmark managerial interest—its interest regarding labor-management relations—from the general interest of the enterprise, shared by its professional and technical employees, in providing high-quality service.

### B

In rejecting the Board's approach, the Court relies heavily on *NLRB* v. *Yeshiva Univ.*, 444 U. S. 672 (1980). The heavy weight placed on *Yeshiva* is puzzling, for the Court in that case noted with approval the Board's decisions differentiating professional team leaders (or "project captains") from "supervisors." Such leaders are "employees," not "supervisors," the Board held, and the Court agreed, "despite [their] substantial planning responsibility and authority to direct and evaluate team members." *Id.*, at 690, n. 30. "In the health-care context," specifically, the Court in *Yeshiva* observed, "the Board asks in each case whether the decisions alleged to be managerial or supervisory are 'incidental to' or 'in addition to' the treatment of patients." That approach, the Court said in *Yeshiva*, "accurately capture[d] the intent of Congress." *Id.*, at 690.

---

explained, however, that persons having authority "responsibly to direct" other employees are persons with "essential managerial duties" who rank "above the grade of 'straw bosses, lead men, set-up men, and other minor supervisory employees,' as enumerated in the [Senate] report." 93 Cong. Rec. 4678 (1947), Legislative History 1303 (remarks of Sen. Flanders). As explained above, the Board has used this same analogy to straw bosses and leadpersons to determine whether particular nurses are supervisors. See *supra*, at 592–593.

The Court today also expresses doubt whether "the statute permits consideration of the potential for divided loyalties." *Ante,* at 580 (implying that consideration of this potential would entail a "unique interpretation [of the statute] . . . in the health care field"). But again, *Yeshiva* points the other way. The Court's opinion in *Yeshiva* acknowledged that the Act's exclusion of supervisors "grow[s] out of the . . . concern . . . [t]hat an employer is entitled to the undivided loyalty of its representatives." 444 U. S., at 682. The Court decided that the Yeshiva University faculty members were not entitled to the Act's protection, precisely because their role as "representative" of the employer presented a grave danger of divided loyalties. The Yeshiva faculty, the Court stated, was pivotal in defining and implementing the employer's managerial interests; its "authority in academic matters [wa]s absolute," and it "determine[d] . . . the product to be produced, the terms upon which it will be offered, and the customers who will be served." *Id.,* at 686. No plausible equation can be made between the self-governing Yeshiva faculty, on one hand, and on the other, the licensed practical nurses involved in this case, with their limited authority to assign and direct the work of nurses' aides, pursuant to professional standards.

## V

The Court's opinion has implications far beyond the nurses involved in this case. If any person who may use independent judgment to assign tasks to others or direct their work is a supervisor, then few professionals employed by organizations subject to the Act will receive its protections.[17] The

---

[17] As the Board repeatedly warned in its presentations to this Court: "If all it took to be a statutory supervisor were a showing that an employee gives discretionary direction to an aide, even though done pursuant to the customary norms of the profession, the coverage of professionals would be a virtual nullity." Brief for Petitioner 27; see also *id.,* at 12, Reply Brief for Petitioner 7–8 (filed Jan. 5, 1994).

Board's endeavor to reconcile the inclusion of professionals with the exclusion of supervisors, in my view, is not just "rational and consistent with the Act," *NLRB* v. *Curtin Matheson Scientific, Inc.,* 494 U. S. 775, 796 (1990); it is *required* by the Act. I would therefore reverse the contrary judgment of the Court of Appeals.