164 F.3d 644
 160 L.R.R.M. (BNA) 2269, 334 U.S.App.D.C. 65,
137 Lab.Cas. P 10,333
 VIP HEALTH SERVICES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Local 2, Federation of Nurses, United Federation of
Teachers, American Federation of Teachers,
AFL-CIO, Intervenor.
 No. 97-1608.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 1, 1998.
Decided Jan. 12, 1999.
 
 David Lew argued the cause for petitioner. With him on the briefs was Gary Rothman.
 David Habenstreit, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Vincent J. Falvo, Jr., Attorney. Meredith L. Jason, Attorney, entered an appearance.
 Mitchell H. Rubinstein argued the cause for intervenor. With him on the brief was James R. Sandner.
 Before: WALD, SILBERMAN and GARLAND, Circuit Judges.
 WALD, Circuit Judge:
 
 
 1
 Local 2, Federation of Nurses, United Federation of Teachers, American Federation of Teachers, AFL-CIO ("union") filed a petition with the National Labor Relations Board ("NLRB" or "Board") in 1993 seeking to be certified as the exclusive bargaining representative of nurses employed in New York by VIP Health Services, Inc. ("VIP"). The proposed bargaining unit included field nurses who are assigned by VIP to adult care facilities operated by other entities and to private residences. VIP objected to the unit, arguing that the field nurses are supervisors and therefore ineligible for inclusion. After a hearing, the hearing officer determined that the field nurses are not supervisors. The NLRB Regional Director affirmed in a detailed opinion and ordered an election. VIP's requests for review and reconsideration were denied by the Board and the union won the election. The union was certified on November 27, 1996.
 
 
 2
 Less than five months later, the General Counsel of the NLRB charged VIP with refusing to bargain with the union in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (5). VIP defended by challenging the validity of the underlying representation proceeding on the ground that the field nurses are supervisors.[1] The Board granted the General Counsel's summary judgment motion, finding no cause to reexamine the decision made in the earlier representation proceeding. The Board then ordered VIP to cease and desist from refusing to bargain with the union and to take related actions. VIP petitions for review of the Board's decision and the Board cross-petitions for enforcement of its order. Because the Board, in upholding its Regional Director, properly determined that the field nurses are not supervisors, we deny VIP's petition and grant the Board's cross-petition for enforcement.
 
 I. BACKGROUND
 
 3
 VIP employs thirty to forty field nurses; the precise number fluctuates. Almost all of these nurses work in a dozen or so adult care facilities that are not operated by VIP. A few care for patients in private homes. The residents of the facilities and the patients served in their own homes are elderly or mentally disturbed, but require less care than people who live in nursing homes. Overall, VIP field nurses provide care to approximately 800 patients. The tasks performed by the nurses include giving insulin and other injections, dressing wounds, and taking vital signs.
 
 
 4
 Some of the 800 patients also receive care requiring less skill from home health aides ("HHAs"). An individual HHA typically works with three to five patients a day, spending two or three hours with each. The group of patients seen by an HHA is called a "cluster." HHAs help patients in the activities of daily life, such as moving about, bathing, dressing, eating, getting to the dining room for meals, and getting to appointments. VIP employs as many as twenty HHAs, but purchases the services of at least another hundred HHAs from other agencies.[2]
 
 
 5
 The witnesses presented by VIP and the union in the representation proceeding painted dramatically different pictures of the relationship between field nurses and HHAs. Testifying on behalf of VIP, Marilyn Pierre and Rena Dern[3] asserted that the nurses play the lead role in "reclustering." That is the term used at VIP to describe changes in the group of patients assigned to an HHA. Reclustering is necessitated by, for example, the arrival of a new patient who needs the help of an HHA or the temporary departure of a patient for the hospital. According to Pierre and Dern, by controlling the reclustering process the nurses not only decide what work each HHA is to perform but also how much money she receives because HHAs are paid on an hourly basis. By contrast, four field nurses--Denise Drury, Janice Derose, Yolaine Mesidor, and Marie (Nellie) St. Surin--testified for the union and stated that they have no control over reclustering or otherwise assigning work to HHAs. Rather, the nurses testified that they do no more than notify staff at VIP's office of the need for schedule changes in order to ensure complete patient coverage or, at one facility, leave the job of arranging the changes to a senior HHA at the facility.
 
 
 6
 Pierre also testified that field nurses play a substantial role in disciplining and discharging HHAs. She explained that when a nurse is not satisfied with an HHA she may tell Rena Dern in the VIP office that the HHA should be removed from the facility, and Dern will comply. Pierre further stated that eighty to one hundred HHAs have been removed from their jobs in this manner. When HHA behavior does not merit dismissal, such as reporting to work late, the nurses counsel HHAs and may write them up, according to Pierre. The field nurses, on the other hand, denied having any such power or responsibility. As with reclustering, they testified that the most they do is bring a problem to the attention of VIP office staff, and that they neither recommend nor direct that a particular action be taken with respect to the HHA involved.
 
 
 7
 Pierre further testified that when HHAs have problems with their peer HHAs or with other employees of the adult care facility, or want to work more hours, they go to the field nurse who is empowered to address such issues. All four nurses testified that they lack the authority to adjust HHAs' grievances.
 
 
 8
 The virtually complete disagreement expressed by the witnesses presented by VIP and the union over the role played by nurses in reclustering, disciplining, discharging, and handling grievances is absent in testimony about the role they play in creating "plans of care" for each patient. There appeared to be general agreement that the nurses are involved in writing two types of plans--nurse plans of care and HHA plans of care. The latter details the responsibilities of an HHA with regard to a particular patient, but the former does not appear to be limited to describing the responsibilities of a nurse. According to Pierre--VIP's witness--the nurse plan of care also describes services that an HHA will provide.[4] The nurse plan of care evidently lists the HHA's responsibilities at a more generalized level than the HHA plan of care, however.
 
 
 9
 The nurse plan of care is written in light of a doctor's prior assessment of and orders for the patient, and must be approved by the doctor. The plan is drafted by the field nurse and an intake nurse who works at VIP's office, although the relative control exercised by each over the contents of a plan is disputed; Pierre testified that the intake nurse performs an essentially clerical function, relying on the field nurse's determinations, while Derose and Drury (two of the field nurses) testified that the intake nurse makes final decisions about what to include in the plan sent to the doctor for approval. An HHA plan of care is created by filling in a onepage form which lists tasks that an HHA might be required to perform or assist the patient with.[5] Next to each task is space for "instructions" and "frequency of task," as well as a column for prioritizing the tasks. Like a nurse plan of care, an HHA plan of care is shaped by an assessment and orders from the patient's doctor. It also reflects what is contained in the doctor-approved nurse plan of care with respect to an HHA and may be based in part on a field nurse's observations of the patient. Whether a field nurse writes an HHA plan of care alone or in conjunction with an intake coordinator is not clearly answered in the testimony. One field nurse did testify, however, that HHA plans of care are reviewed by nursing coordinators, although she could not speak to the frequency of such review.
 
 
 10
 The field nurses also complete "home health aide supervisory reports" for each patient/HHA combination every two weeks.[6] This involves checking "satisfactory" or "not satisfactory" for categories like "reports for work as scheduled," "adequate verbal and written communication skills," "follows client care plan," competency in shampooing the patient, and compliance with VIP's dress code.[7] Categories are left blank when they are not relevant to the care given to the particular patient, and even sometimes when they are relevant. The nurses testified that some of the categories require no more than observation of the patient at the time the form is completed. For example, if the patient appears to be clean, the HHA's performance is listed as satisfactory for the relevant categories. The nurses also explained that they do not continually monitor HHAs with respect to categories that would seemingly require such scrutiny, instead basing their decision on what they perceive at the moment when they are completing the form. Although the record contains over one hundred completed reports, not a single "not satisfactory" or "not met" rating appears in them.
 
 
 11
 Finally, two of the nurses--Mesidor and St. Surin--testified that when they encounter a patient in need of certain care such as a shampoo, they tell the assigned HHA to perform that task. Both stated that this does not occur often. Another nurse, Drury, also testified that she sometimes directs HHAs to complete specific tasks related to a patient's needs. Similarly, Drury stated that she sometimes demonstrates to an HHA how to perform a task after noticing that it is not being done properly.
 
 II. DISCUSSION
 The NLRA defines supervisors as:
 
 12
 [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 13
 29 U.S.C. § 152(11). For an employee to qualify as a supervisor, then, three requirements must be met: the employee must possess at least one of the twelve types of authority set out in the statute, the exercise of that authority must require the use of independent judgment, and the authority must be held in the employer's interest. See Beverly Enterprises-Pennsylvania, Inc. v. NLRB, 129 F.3d 1269, 1270 (D.C.Cir.1997) (per curiam) (citing NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 573-74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994)). "Independent judgment," contrasted by the statute with authority of a "routine or clerical nature," is an ambiguous phrase that the Board must be given "ample room to apply." Health Care & Retirement Corp., 511 U.S. at 579, 114 S.Ct. 1778.
 
 
 14
 VIP argues that the Board erred in determining that the field nurses are not supervisors under the NLRA. If VIP is correct, the Board approved an inappropriate bargaining unit because supervisors are excluded from the NLRA's collective bargaining protections. See 29 U.S.C. § 152(3); Beverly Enterprises v. NLRB, 148 F.3d 1042, 1045 (8th Cir.1998).
 
 
 15
 A. Assigning, Discharging, Disciplining, and Adjusting Grievances
 
 
 16
 VIP argues that the evidence presented at the hearing on the appropriateness of the bargaining unit demonstrates that field nurses assign HHAs work through the reclustering process, that field nurses effectively recommend discharge and discipline of HHAs by directing staff at VIP's office to take such actions, and that field nurses adjust HHAs' grievances. VIP is correct that there is much evidence to support these claims, but much directly contradicts them. The Regional Director, whose opinion we are functionally reviewing, resolved these contradictions in favor of the union, i.e., finding that the field nurses do not have the authority to assign, discharge, or discipline HHAs, or to adjust their grievances.
 
 
 17
 These factual findings need only be supported by substantial evidence. See 29 U.S.C. § 160(e); Allegheny Ludlum Corp. v. NLRB, 104 F.3d 1354, 1358 (D.C.Cir.1997). They are. Several of the nurses offered extensive and consistent testimony to the effect that they do not possess any authority in these areas. With respect to relaying problems with HHAs to the VIP office, which the nurses acknowledged they sometimes do, mere reporting is insufficient to establish that the nurses effectively recommend discharge or discipline.[8] See NLRB v. Dickerson-Chapman, Inc., 964 F.2d 493, 500 (5th Cir.1992).
 
 
 18
 VIP's citation to Passavant Retirement & Health Center v. NLRB, 149 F.3d 243 (3d Cir.1998), does not rescue its case. In Passavant, the court found that the authority of nurses to send aides home for flagrant violations, such as abusing a patient, constituted authority to discipline involving the use of independent judgment. See id. at 249. Evidence that VIP's field nurses can unilaterally discipline HHAs is contradicted by the nurses' testimony. Because the finding that field nurses do not discipline HHAs is supported by substantial evidence, we do not reach the question considered in Passavant, for which VIP evidently cites the case, of whether such authority involves independent judgment.
 
 B. Responsibly Directing Other Employees
 
 19
 VIP also argues that the field nurses responsibly direct the work of the HHAs. VIP offers three bases for this conclusion--the field nurses formulate the HHA plans of care, they tell HHAs to perform certain tasks and show them how to do so correctly when improvement is needed, and they complete bi-weekly evaluation forms. The Regional Director found that any direction given by the nurses does not involve independent judgment, the second of the three requirements in the statutory definition of supervisor. The record supports this conclusion.
 
 
 20
 With respect to the HHA plans of care, nurses are involved in writing them, but substantial evidence demonstrates that they act within a framework established by the patient's doctor. Further, one of the nurses testified that the plans are reviewed by the nursing coordinators. Even though to some degree a field nurse's own judgment is relevant in the creation of a plan, substantial evidence shows that the judgment of others figures much more prominently, rendering the nurse's role primarily a routine one. See Beverly Enterprises-Pennsylvania, Inc., 129 F.3d at 1270 ("If an individual's discretion with respect to ... statutory factors is tightly constrained, then her exercise of that authority is 'routine' and does not involve 'independent judgment.' ").
 
 
 21
 With respect to assigning and demonstrating specific tasks to the HHAs, we have previously held that this basic task is also routine. In Beverly, we considered a situation in which a nurse might tell a nursing assistant to "monitor[ ] vital signs more frequently or clean[ ] up a mess." Id. We upheld the Board's determination that such direction of an assistant was "merely routine." Id. The types of discrete tasks that the field nurses have acknowledged they sometimes do are comparable. As the Regional Director noted, "it only takes common sense if a patient is not properly cleaned or dressed to then instruct the aide to rectify the situation." J.A. at 33. The Regional Director properly called the nurses' role in this area routine.
 
 
 22
 With respect to the bi-weekly evaluation forms, the field nurses testified, essentially, that they do not take great care in filling them out.[9] They explained that they do not base their ratings on regular monitoring of the HHA over the two week period. In lieu of a real inquiry into the HHA's work and skills, the nurses explained that they make a quick, impressionistic judgment at the moment when they are filling out the form. We think it within the Board's discretion in interpreting the phrase "independent judgment" to treat it as excluding such unstudied appraisals. The lack of any "not satisfactory" or "not met" ratings on the many forms in the record also suggests that completion of the forms is perceived as a routine duty.
 
 
 23
 Mid-America Care Found. v. NLRB, 148 F.3d 638 (6th Cir.1998), does not convince us otherwise. In that case the fact that the nurses completed evaluation forms for assistants was an important reason for the court's rejection of the Board's finding that the nurses were not supervisors, see id. at 641, but filling out the forms there required much greater precision; assistants were rated in forty-one categories on a fourpoint scale. See id. at 640. Nurses were also required to recommend dismissal, continuation, or other action with respect to the assistant on the form, and three disciplinary recommendations resulted in automatic termination. See id. No evidence shows that the forms completed by VIP field nurses here play any such significant role, as the attitude of the nurses toward their completion convincingly indicated.
 
 
 24
 C. Field Nurses As the Only On-Site Supervisors of the HHAs
 
 
 25
 VIP argues that the field nurses must be supervisors because, if they are not, VIP is left without any on-site supervision of the HHAs. This argument is without basis in the statutory definition of supervisors. Congress did not direct that the NLRA be interpreted such that there must be "supervisors" in every workplace. We agree with the Regional Director, who stated that "[i]f the persons whom the Employer contends are in charge do not possess Section 2(11) supervisory authority, then the absence of anyone else with such authority does not then automatically confer it upon these nurses." J.A. at 35. See NLRB v. KDFW-TV, Inc., 790 F.2d 1273, 1279 (5th Cir.1986) (highest ranking employees on duty are not supervisors during hours when supervisory employees are not present). There is no necessary nexus between the NLRA definition of a supervisor and personnel management principles or perceptions.[10]
 
 III. CONCLUSION
 
 26
 There was substantial evidence that the field nurses are not supervisors under the NLRA; we therefore deny VIP's petition for review and grant the Board's cross-petition for enforcement of its order.
 
 
 27
 So ordered.
 
 
 
 [1]
 Because certification of a bargaining unit by the Board in a representation proceeding is not an "order" subject to judicial review, see American Fed'n of Labor v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), review of certification may occur in a later unfair labor practice proceeding
 
 
 [2]
 Most of the HHAs that VIP places but does not directly employ come from its parent agency, VIP Health Care Services
 
 
 [3]
 Pierre and Dern are VIP employees who work in VIP's office, not at locations where patient care is rendered. Pierre is the administrator/director of patient services. Dern is the administrative supervisor
 
 
 [4]
 An HHA is only assigned to a patient in the first place upon doctor approval, evidently a necessity for insurance coverage. VIP's contention in its brief that the field nurses determine whether a patient is given an HHA, see Pet'r. Br. at 19, is not even supported by the testimony of its own witnesses
 
 
 [5]
 The form lists: personal care (specify), exercise, ambulation/transfers, stairclimbing, accompany patient to, diet (specify), feeding, meal preparation, housekeeping, shopping, laundering, eye care, dressing (wound care), catheter care (specify), ostomy care (specify), enema (specify), temperature, pulse, respiration record in home, assist with medications, other (specify). Joint Appendix ("J.A.") at 928
 
 
 [6]
 Completion of the form is evidently an insurance requirement
 
 
 [7]
 Other columns on the form with the headings "corrective action taken" and "remarks" appear to be rarely if ever used
 A prior version of the form used "exceeded," "met," "not met," and "not observed."
 
 
 [8]
 VIP's contention that one of the nurses admitted, on three occasions, that she has gone beyond simply reporting problems and has recommended action that VIP then took is based on a misreading of the record. Drury told the VIP office about an HHA who took a patient to Waldbaum's when the patient needed to be at the adult care facility in order to receive insulin. Contrary to VIP's claim, Drury testified that she could not remember whether she told the office that the HHA should be removed from the patient. Similarly, Drury testified that she once reported to the office that she had been threatened by an HHA. The HHA was removed from the facility, but Drury did not testify about any role other than reporting the incident. Drury also testified about informing the office that an HHA had allowed a disoriented patient to wander the streets around the facility alone. Again, Drury did not recall what if anything she said about removing the HHA
 
 
 [9]
 Evaluating employees, though not mentioned in the statutory definition of supervisor, would be relevant to directing the work of those employees insofar as it affected their future tasks
 
 
 [10]
 The Board offers one additional reason why the field nurses are not supervisors. It argues that a finding that the nurses are supervisors will result in an unrealistic supervisor/HHA ratio. There are only twenty or so HHAs who are directly employed by VIP but there are thirty to forty field nurses, and "[t]he ratio of supervisors to non-supervisory employees is often significant in determining whether an employee has supervisory status." Beverly Enterprises, 148 F.3d at 1047. Because we uphold the determination that the field nurses are not supervisors on the other grounds discussed above, we do not reach this argument