NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO (Doctors' Council of Cook County Hospital), Petitioners-Appellants, v. THE COUNTY OF COOK (Cook County Hospital) *et al.*, Respondents-Appellees.

First District (5th Division) No. 1—96—2690

Opinion filed March 20, 1998.

HOFFMAN, P.J., dissenting.

Cornfield & Feldman, of Chicago (Jacob Pomeranz, of counsel), for petitioners.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Mary E. Welsh, Assistant Attorney General, of counsel), for respondents.

JUSTICE HARTMAN delivered the opinion of the court:

This case is before us on direct review[1] of an administrative order entered by respondent Illinois Local Labor Relations Board (Board), dismissing a petition seeking union representation. In 1987, respondent Board had concluded that attending physicians[2] (Attendings) in practice at Cook County Hospital (Hospital) were "supervisors" within the meaning of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1603(r)) and, therefore, were not eligible for union membership. After similar, subsequent union representation efforts failed, on February 24, 1995, petitioner National Union of Hospital and Health Care Employees (Union) (formerly identified as American Federation of State, County and Municipal Employees, AFL-CIO) again petitioned the Board, seeking to represent Attendings, among others not involved in this appeal, and claiming a substantial change in the duties performed by Attendings and a change in case law. Respondent County of Cook (Employer), which owns and operates the Hospital, challenged the petition.

A hearing was conducted before an administrative law judge (ALJ), who concluded that Attendings were not supervising employees within the meaning of the present statute, section 3(r) of the Act (5 ILCS 315/3(r) (West 1994)) (section 3(r)), and recommended to the Board that an election be ordered. As authorized by section 1210.100(n) of the Illinois Administrative Code (80 Ill. Adm. Code

---

[1]Pursuant to Supreme Court Rule 335 (155 Ill. 2d R. 335; 735 ILCS 5/3—113 (West 1994)).

[2]Appointed positions occupying 50% or more of their time, which were found to mean those who work 20 hours or more per week in such appointments.

§ 1210.100(n) (1996)), to "adopt all, part, or none of the [ALJ's] recommendation depending upon the extent to which it is consistent with the record and the applicable law," the Board adopted only the ALJ's findings of fact, but differed with his factual and legal conclusions and ruled that Attendings were indeed statutory supervising employees, and dismissed the 1995 petition, holding that there was no change in fact or law that required reexamination of its 1987 decision. The Union seeks administrative review.

■ The principal issue presented for review in the instant proceedings is whether the Board erred in concluding that Attendings are "supervisors" within the meaning of section 3(r)[3] of the Act, as a matter of fact or law. Section 9(i) of the Act (5 ILCS 315/9(i) (West 1994)) makes the Board's dismissal order reviewable under the Administrative Review Law (735 ILCS 5/3—101 et seq. (West 1994)). Administrative review extends to all questions of law and fact presented by the record. The Board's findings and conclusions must be considered prima facie true and correct. 735 ILCS 5/3—110 (West 1994).

The Board's determination cannot be impeded absent a showing that its expertise and authority have been exercised arbitrarily and capriciously; it can be overturned only when, after viewing the evidence in a light most favorable to the Board, it can be said that no rational trier of fact could have arrived at the conclusion reached by the Board. Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31, 153 Ill. 2d 508, 514, 607 N.E.2d 182 (1992) (Chief Judge). To neutralize the possibility that a pro-union bias might impair a supervisor's ability to apply the employer's policies to subordinates in accordance with the employer's best interests, the Act provides that a bargaining unit may not contain both supervisors and nonsupervisors. 5 ILCS 315/3(s)(1) (West 1994); Chief Judge, 153 Ill. 2d at 515; City of Freeport v.

---

[3]The Act defines a "supervisor" as:

"an employee whose principal work is substantially different from that of his or her subordinates and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, direct, reward, or discipline employees, to adjust their grievances, or to effectively recommend any of those actions, if the exercise of that authority is not of a merely routine or clerical nature, but requires the consistent use of independent judgment. *** [T]he term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising that authority." 5 ILCS 315/3(r) (West 1994).

*Illinois State Labor Relations Board*, 135 Ill. 2d 499, 505-06, 554 N.E.2d 155 (1990) (*City of Freeport*).

From the record the following facts appear. Respondent Employer owns and operates the subject institution, a 918-bed acute-care teaching hospital, in Chicago. Under the Hospital's corporate bylaws, the Cook County Board of Commissioners (CCBC) is responsible for the management, control, and operation of the Hospital. The Hospital director, its chief operating officer, is responsible for the Hospital's day-to-day affairs. The medical director is charged with supervising medical affairs. The executive medical staff (EMS) is obligated to oversee patient care and the ethical conduct and professional practices of its members, and is accountable to the CCBC and the Hospital administration. A joint conference committee (JCC), whose 12 members represent equally each entity, acts as liaison between CCBC and the EMS. JCC serves as a forum for policy and practice matters that require agreement between CCBC, the Hospital administration, and the medical staff, and provides the formal means for the medical staff to participate in the development of Hospital policies relative to both Hospital management and patient care.

Administratively, the Hospital is comprised of 11 clinical departments, which are further divided into divisions and sections. At the relevant time, the Hospital employed almost 6,000 full-time employees, of whom approximately 200 were Attendings, and 530 were residents. A resident is a medical school graduate and "physician in training."

Among the documents filed in the 1995 proceedings were the Hospital corporate bylaws, which set up the structure for management, control and operation of the Hospital, and assigns certain powers and responsibilities of the Hospital director, the medical director, and the medical staff. Also filed in the present proceedings were the Hospital medical staff bylaws, which set forth parameters for the management of patient care at the Hospital. Attendings receive and are required to read copies of the medical staff bylaws and rules and regulations upon their employment as Attendings and follow them.

Under the corporate bylaws, the Hospital's chief operating officer receives recommendations from the medical staff regarding appointments, reappointments, and determinations of clinical privileges and transmits them to the JCC.

All Attendings employed by the Hospital are members of the medical staff. Residents are not. Under the medical staff bylaws, residents are appointed to a graduate training program at Cook County Hospital and participate in patient care under the direction of licensed practitioners. The medical staff Attendings are required to

adopt bylaws, rules and regulations for governing the Hospital's medical practice, as deemed appropriate by the county board, for the care of Hospital patients and for the furtherance of the Hospital's objectives in the community.

The medical staff Attendings provide continuing professional education, shaped primarily by needs identified through review and evaluation activities; on-going monitoring of patient care practice; and retrospective review and evaluation of the quality of patient care. They supervise clinical affairs, which includes enforcing medical staff bylaws, rules and regulations, clinical policies and consultation requirements; initiating disciplinary action; and providing surveillance over requirements for monitoring and for the exercise of clinical privileges.

A collective bargaining agreement (Agreement) presently exists between the Hospital and the residents represented by the Union, which reflects the supervisory relationship between the Attendings and residents. Article III, section 1, of the Agreement provides that residents may advance through the residency program after satisfactory completion of each year of service at a given level unless the hospital or resident wishes to terminate the resident's employment in a given department. Article VIII, section 3, requires evaluation of each resident on each rotation of duty, but not less than every two months, by completion of a written and oral evaluation by the immediate supervisory Attending, followed by placement in the resident's official file a written evaluation for the subject period. Disciplinary actions authorized in article IX, section 1, include verbal and written reprimand, suspension, discharge, transfer from a given patient area in response to complaints of a supervisor against a resident, assignment to more than the customary time in the patient care area because of poor performance, curtailment of customary privileges and responsibilities in a given area, probation and/or demotion.

Article X, section 5, of the Agreement provides that "[i]n order to make available the highest quality of medical care for patients and to provide and maintain a suitable learning and work environment for [residents] covered by this Agreement, the County will ensure that adequate numbers of Attending staff are available at all times to supervise [residents] who are on duty. Attendings supervising ward services will arrive promptly on the end of call periods and conduct rounds in a timely fashion. Cook County Attending staff will be present at all hours in the emergency areas. [Residents] are responsible for keeping their Attending physicians apprised of the patients' conditions and any changes thereof. However, it is understood that the attending physicians are ultimately responsible for the care of the patients."

In the 1995 action, the Union maintained that Attendings' duties and responsibilities had changed since the Board's prior decisions, citing a statement from the Hospital's policy manual that the Attendings shall "provide more specific documentation of 'the participation and supervision of the care given to the patient by the Attending[s].'" The Union also insisted that the rationale of the Board's 1987 decision conflicted with the reasoning in a case decided by the supreme court in 1990, *City of Freeport,* because the time Attendings spent on actual patient contact, such as initial examinations, had increased since the Board's prior decisions. The Employer (county) opposed the petition. The ALJ ordered a new hearing. The parties filed certain stipulated findings of fact and presented documents and the testimony of numerous witnesses. Approximately 1,600 pages of documents and other evidence were filed by the parties who, following the hearing, submitted briefs. The ALJ filed the recommended decision and order, referenced earlier in this opinion, on October 5, 1995.

The ALJ rejected the Union's contention that Attendings' work was no different, factually or legally, from that of residents, concluding that "the principal work of [A]ttendings is obviously and visibly different from that of their subordinates for [A]ttendings, unlike residents, perform little direct patient care and perform no nursing care." He also found that "as compared to 1986, [A]ttendings spend more time with residents and they more closely observe the activity of residents and other staff."[4]

Nevertheless, the ALJ recommended that Attendings be found not to exercise supervisory "direction" over their subordinates within the meaning of the Act, because the Attendings were not acting out of concern for the Hospital's interest as an employer or of an Attending's standing as an employer representative, but their performance was based on superior skills and technical expertise; therefore, no statutory supervisory authority was exercised in the interest of the Employer.

Because the Board referred to its 1987 decision in dismissing the present petition, that decision will be reviewed briefly. The 1987 Board decision followed extensive hearings at which 42 witnesses

---

[4]The ALJ found that, given the testimony as a whole, approximately 80% of an Attending's time was spent instructing, monitoring, and reviewing the efforts of residents and nursing staff in providing patient care, including case presentations and other discussions with residents regarding patient care, signing off on medical orders and charges, and periodically reviewing patient charts. Another 10% of an Attending's time was spent in committee work, didactic lectures, medical research and preparations for such activities, and the remaining 10% was spent on direct patient care.

were heard and documentary evidence considered. The Board there found that Attendings were responsible for seeing that the residents' direct care of patients was adequate and proper, which could be achieved by "active intervention with such subordinate personnel, and through example, gentle guidance, silent observation, and, if necessary, through formal discipline." Attendings were "supervising" those within their oversight responsibility not only when interacting overtly to instruct, correct, or reprimand them, but also when teaching or training them, spending more than half their time performing these functions. The Board found that Attendings had "individual and combined responsibilities to the patients, the institution and the requirements of their professions," and recognized "the special relationship" between Attendings and their subordinates, concluding that Attendings were "supervisors" within the meaning of the Act.[5] *Cook County Hospital*, 3 Pub. Employee Rep. (Ill.) par. 3032, No. L—RC—85—10, at IX—187 (ILLRB October 15, 1987).

The Board heard argument in the present, 1995, proceedings and, as earlier noted, thereafter adopted the ALJ's findings of fact, but differed in the conclusions to be drawn therefrom, ruling that Attendings are supervisory employees, in accordance with section 3(r) and its earlier decisions. The Board reviewed the evidence in the present record and found that the "facts *** are essentially unchanged from those established in 1987," when it first determined that Attendings' subordinates provided direct patient care while Attendings instructed, monitored, reviewed, and corrected their subordinates to ensure that the care provided was necessary and appropriate. The Board concluded that Attendings' principal work continued to be substantially different from that of their subordinates, observing that "the only significant difference" in the facts underlying

---

[5]In 1988, the Board dismissed a similar representation petition by the Union, finding that the petitioner had not demonstrated any change in circumstances justifying reconsideration of Attendings' supervisory status. *Cook County Hospital*, 4 Pub. Employee Rep. (Ill.) par. 3017, No. L—RC—88—20, at XI—111 (ILLRB May 18, 1988). In 1992, the Board again was asked to reexamine Attendings' supervisory status, this time in the context of an unfair labor practice matter. There, the Union argued that certain Attendings' conduct was not imputable to their employer because they could not be considered "supervisors" after the Illinois Supreme Court decided *City of Freeport*. The Board disagreed with the assertion that *City of Freeport* had changed the "preponderance" requirement of section 3(r) as previously interpreted by the Board. *County of Cook*, 10 Pub. Employee Rep. (Ill.) par. 3008, Nos. L—CA—91—044, L—RC—91—007, at XI—31 (ILLRB August 27, 1994).

its 1987 decision was that Attendings now spent even more of their time on these oversight functions.

Also rejected by the present Board was the ALJ's view that the Board had not addressed whether Attendings' direction was based solely on superior skill rather than on true supervisory direction exercised in the Employer's interest. In its 1987 decision, the present Board explained, it had recognized that the purpose of Attendings' oversight of their subordinates was to ensure the health and safety of the Employer's patients as well as to train and instruct residents in proper medical knowledge, skills, and conduct. The Board reasoned that it was in the Hospital's interest to train residents, which helped them become productive employees; optimum patient care is a strong employer interest; and its 1987 decision had been based on the conclusion that Attendings' oversight of their subordinates' work ensured this level of care. Furthermore, the Board observed, Attendings also assessed the residents' compliance with Hospital directives, and Attendings' interaction with residents was not limited to handling medical situations. Because their functions were closely identified with the Hospital's interests, the Board concluded, Attendings are "key members of the Hospital management team" and consistently use independent judgment in determining how best to accomplish the necessary training and evaluation of their subordinates.

I

As its principal argument, the Union insists that the Board was wrong as a matter of law in concluding that Attendings are "statutory supervisors" within the meaning of the Illinois Public Labor Relations Act, relying substantially upon the supreme court decision in *City of Freeport*. Specifically, the Union maintains that the Employer has not vested Attendings with the authority to discipline, reward, lay off, recall, award, or grant overtime to those who work with their patients, and asserts that instructing, monitoring, reviewing, and correcting the work of such other employees are not statutory supervisory functions, nor does the fact that a doctor is responsible to his patient for medical care fall under this statutory requirement. The necessary test, the Union argues, requires that a distinction be drawn between an Attending who functions as a professional and one who is a supervisor of professionals.

■ A four-part test has been articulated by the supreme court to determine whether an employee is a supervisor under section 3(r) of the Act, as follows:

> "(1) the supervisory employee must perform principal work substantially different from that of [his or] her subordinates; (2)

the supervisory employee must have authority to perform some or all of the 11 functions enumerated in section 3(r); (3) the supervisory employee must consistently use independent judgment in the performance of these 11 enumerated functions; and (4) generally, the supervisory employee must devote a preponderance of [his or] her time to exercising the authority to handle these 11 functions." *Chief Judge*, 153 Ill. 2d at 515.

The facts, conclusions to be drawn therefrom and the law applicable to this case demonstrate that the Board justifiably concluded that Attendings were supervisors, in contemplation of the above-quoted requirements.

### A

Since the record supports the ALJ's finding and the Board's conclusion that "the principal work of [A]ttendings is obviously and visibly different" from that performed by residents, the first criterion need not be analyzed here.

### B

The next standard, that Attendings must possess authority to perform some or all of the 11 functions set forth in section 3(r), or to effectively recommend such action, in the interest of the employer, with the consistent use of independent judgment, also has been met and supports the Board's decision, as shown in the following discussion.

The term "preponderance" means that the employee spends more time on supervisory functions than on any one nonsupervisory function. *City of Freeport*, 135 Ill. 2d at 532. The presence of even 1 of the 11 indicia of supervisory authority accompanied by independent judgment is sufficient to support a finding of supervisory status, "independent judgment" meaning that the employee makes choices between two or more significant courses of action without substantial review by superiors. *Chief Judge*, 153 Ill. 2d at 516.

The record shows that Attendings overwhelmingly fulfill at least one of the statutory criteria, in that they clearly and continually "direct" the activities of their subordinates. For example, the ALJ concluded that "attendings spend more time with residents and they more closely observe the activities of residents and other staff." The job description of Attendings expressly provides that their duties include "the direction and training of [residents] under their jurisdiction as a means of insuring the quality of care falling within their respective assignments." Minimum qualifications for Attendings expressly include the "ability" to assign and supervise the work of residents. Other official Hospital documents, policies, rules, bylaws,

and directives make it even clearer that the Hospital authorizes and relies upon Attendings to supervise and direct residents.

This Hospital policy also prescribes that each of the 11 departments has written guidelines for resident supervision, which must be approved by the institution and communicated throughout the applicable department. These departmental policies must insure that residents are provided with prompt communication and appropriate involvement of supervisory Attendings and that Attendings "must be available at all times to participate in management decisions." Further, each of the Hospital's departmental resident supervisory policies denotes that Attendings are the employees assigned to direct and supervise residents as the latter, as physicians in training, learn to deliver and do deliver patient care on behalf of the Hospital.

As all parties acknowledge, the Hospital is an acute-care teaching institution in which the Attendings are the teachers. It is commonly understood that to "teach" is to "direct."[6] The ALJ and the Union do not dispute the teaching role fulfilled by the Attendings, but somehow attempt to separate teaching from supervisory activities. There is evidence in the record to support the Board's differing conclusion, that teaching is an integral part of ongoing supervision. Dr. Avery Hart testified that clinical teaching and supervision are related activities performed simultaneously by the Attendings. He explained that supervision through teaching includes modeling (cognitive) skills as well as guided practice. Dr. John Barrett explained that the purpose of Attendings' teaching of residents is to educate them so that they will be able to deliver better medical care to the Hospital's patients. Dr. James Markey concurred that teaching and supervision occur simultaneously. Although didactic lectures are part of the teaching process, they also are designed to "enable residents to take care of the patients better" and to "familiarize residents with what he or she is going to be working with when they go into the clinic." Attendings determine the content of such lectures, prepare and present them, track residents' attendance and tardiness at the lectures, and evaluate the residents' performance at these sessions at which the Attendings are in charge.

Another function of Attendings' direction of residents involves evaluation, which is regarded as an important component of teaching, promotion, and discipline. It appears from the record that virtu-

---

[6]Teach—"to direct, instruct, or train by precept, example, or experience"; "to direct as an instructor: guide the studies of: conduct through a course of studies: give instruction to." Webster's Third New International Dictionary 2346 (1986).

ally all firsthand evaluations of residents are made by Attendings. On a monthly basis Attendings complete and submit all the resident evaluation forms, which also contain disciplinary or other personnel-related recommendations. According to Dr. Margaret M. Dolan, an associate medical director of the Hospital, this is done because the Hospital regards the Attendings as the residents' supervisors. The parties' collective bargaining agreement makes it clear that the Hospital and the residents' collective bargaining representative, the same labor organization as the Union here attempting to represent the Attendings, both recognize that Attendings are the residents' supervisors.[7]

The Attendings' evaluations of residents are then reviewed by the particular department's promotions and selection committee. As noted by the ALJ, some of those committees have division chairs and section chiefs appointed to them and some do not; however, it appears that Attendings' members predominate on those committees. Division chairs or section chiefs, who sometimes sit on these committees, play a less active committee role because the Attendings are much more familiar with the residents; to the extent that he has interacted with a resident while functioning as an Attending, the division chair or section chief functions in the committee meetings like any other Attending. Further, the committee bases its decisions on the Attendings' evaluations and reports. The Attendings' recommendations generally are followed by the department chair. If the committee utilizes a fact finder, usually it is an Attending on the committee. As Dr. Dolan testified, the evaluations are used for promotion, graduation, counseling, and frequently are the first step in the disciplinary process, which are section 3(r) indicia of supervisor. The ALJ's conclusion that Attendings' evaluation of residents is not a supervisory function under these circumstances was contrary to law and need not have been sustained by the Board. Also, that these evaluations and the Hospital's elaborate evaluation process were established and are performed to further the Hospital's interest are supported by substantial evidence and common sense.

---

[7]For example, article VIII, section 3, of the Agreement, provides, *inter alia*:

> "Each [resident] shall be evaluated *** by completion of a written and oral evaluation by the immediate supervisory Attending Physician, followed by placement in the [resident's] official file a written evaluation ***. It will not be responsibility of the [resident] to secure the evaluations from the supervising attending staff physician and the [resident] shall not be required to seek out his supervising attending staff physician for evaluation."

Additionally, contrary to the ALJ's understanding, the record shows that Attendings do assign and schedule work to residents as part of their supervisory activities. For example, on behalf of the Hospital, Attendings determine what patient care residents are capable of providing, given their progression, skills and the complexity of the problem, as well as what care to give and how to deliver it; cancel surgery; recommend reassignment of residents who disobey instructions and procedures; tell residents where and when to be; approve breaks and schedules; grant or deny time off; and decide whether or not to accept or refuse to let a resident from another department work on their patient. These aspects of the Attendings' function are substantial elements of independent judgment and supervision in furtherance of the Hospital's mission, not simply professionals supervising other professionals in some imaginary vacuum.

The ALJ's conclusions with respect to hiring, another section 3(r) standard to be satisfied, stops short of the evidence. Resident applicants are interviewed and ranked by Attendings, who are also involved in the recruitment and hiring of residents. Attendings do virtually all of the interviewing of resident candidates and they predominate as members on the selection committees. The Attendings rank the candidates and their committees make the hiring recommendations that are uniformly followed without any superior's independent review. Attendings also frequently submit letters of recommendation regarding the hiring of residents and other positions. It is clearly in the Hospital's interest to recruit and hire capable residents. The fact that an Attending does not shove an employment contract in front of a resident candidate for signature does not diminish the important role that Attendings play in the hiring process.

The Union asserts that the Employer has not vested the Attendings with authority to discipline those who work with their patients, another of the indicia of statutory supervisors set forth in section 3(r). The ALJ noted that discipline of residents takes both traditional forms and forms more relevant for and related to professionals in training, but concluded, as does the Union, that Attendings have no actual authority to do so or to recommend effectively such action. Record evidence shows, however, that Attending-generated discipline consists of counseling, oral reprimand, discharge, repeating training, work and rotations, remediation, assignment to extra work, having residents' physician privileges and/or responsibilities curtailed, not being promoted, being placed on probation, and being demoted; however, because residents are highly educated and motivated profes-

sionals, suspension and discharge are rare.[8] In light of the foregoing, the ALJ's conclusion and the Union's assertion that Attendings have no authority for running the institution and its various departments, is akin to the proverbial "failure to see the forest for the trees."

## C

■ The ALJ's conclusion, that "whatever alleged supervisory authority attendings possess and/or exercise that authority is not supervisory authority within the meaning of the Act as it is not principally derived from the Employer as required by the Act," is unsupportable and inexplicable, as has been demonstrated by the previous discussion.[9]

Our supreme court recently considered a similar argument, in deciding whether assistant public defenders represent the interests of their indigent clients but, at the same time, do not represent the interests of the state or chief judge, in *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 687 N.E.2d 795 (1997). That decision quoted with approval an analysis by the United State's Supreme Court which is particularly applicable here:

"In *National Labor Relations Board v. Health Care & Retirement*

---

[8]Attendings perform the evaluations and predominate and play the major role on the committees reviewing resident performance for disciplinary purposes. Examples in the record of discipline that resulted from negative Attending evaluations include a written reprimand; suspension of the resident—although later reduced as part of a subsequent grievance settlement; a resident having to repeat a substantial part of the year; having to repeat rotations due to Attending recommendations; having to repeat a year and losing a year of promotional pay due to Attendings' negative evaluations; being put on probation; and the termination of a resident.

[9]Not only do the above-described documents manifest and reflect the Employer's interest in Attendings' supervisory activities, but witnesses also so testified. One such witness, the emergency medicine department chair, Dr. Robert Simon, explained the reason that the Hospital assigns Attendings to supervise residents is "to ensure *** that the institution is delivering good quality care. They don't want the reputation of Cook County Hospital in the community to be negative *** because patients are coming there and only getting taken care of by residents, by doctors in training." Dr. Simon also noted that the Hospital has liability concerns as well. Another witness, Dr. Robert Berktold, testified that the increased supervision of the residents in the past several years "absolutely" benefits the Hospital: "it cuts down on *** very high profile publicity mistakes and *** it protects the hospital against lawsuits."

*Corp. of America*, 511 U.S. 571, 128 L. Ed. 2d 586, 114 S. Ct. 1778 (1994), the Court was required to determine whether certain nurses should be considered 'supervisors' within the meaning of the National Labor Relations Act. The National Labor Relations Board argued that the nurses were not supervisors because they acted in their own professional interests, not in the interests of their employer. The Court rejected that argument and noted that such an argument had also been rejected in *Yeshiva*:

> 'The Board's interpretation, that a nurse's supervisory activity is not exercised in the interest of the employer if it is incidental to the treatment of patients, is similar to an approach the Board took, and we rejected in *NLRB v. Yeshiva Univ.*, 444 U.S. 672, [63 L. Ed. 2d 115, 100 S. Ct. 856] (1980). There, we had to determine whether faculty members at Yeshiva were "managerial employees." *** Like supervisory employees, managerial employees are excluded from the Act's coverage. [Citation.] The Board in *Yeshiva* argued that the faculty members were not managerial, contending that faculty authority was "exercised in the faculty's own interest rather than in the interest of the university." [Citation.] ***
>
> The Board's reasoning fares no better here than it did in *Yeshiva*. As in *Yeshiva, the Board has created a false dichotomy—in this case, a dichotomy between acts taken in connection with patient care and acts taken in the interest of the employer. That dichotomy makes no sense. Patient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer. [Citation.] We thus see no basis for the Board's blanket assertion that supervisory authority exercised in connection with patient care is somehow not in the interest of the employer.'* *Health Care*, 511 U.S. at 577-78, 128 L. Ed. 2d at 593-94, 114 S. Ct. at 1782.

See also *Chief Judge*, 229 Ill. App. 3d at 187-88 (rejecting the Board's argument that Cook County guardians *ad litem* represented the many individual wards of the court instead of representing the interests of their employer). For similar reasons, we reject the purported distinction as meaningless." (Emphasis added.) 178 Ill. 2d at 345-46.

We agree.[10]

From the foregoing it is clear that the Board's conclusion

---

[10]The ALJ found that Attendings' ultimate authority over patient care is due to their greater skill and experience. Of course, virtually all supervisors have authority over their portion of an operation because of their employer's

denominating Attendings as supervisors within the meaning of section 3(r) of the Act is supported by the record and must be affirmed.

## II

█ The Union, as did the ALJ, places substantial reliance upon the supposition that *City of Freeport* has shifted the law somehow so as to have changed the standards for identifying supervisory status of Attendings in the present case. Having concluded that the role of Attendings at the Hospital when directing residents engaged in patient care activities is the same as that of Village of Wheeling fire department lieutenants at a fire scene, the ALJ found, and the Union argues, that Attendings do not exercise independent supervisory judgment in the interest of the employer, under the circumstances prescribed by *City of Freeport*. We disagree.

Comparison of the role of the Wheeling fire lieutenants at a fire scene with Attendings at the Hospital demonstrates that the latter do perform their function of independently directing residents' patient care activities in the interest of the employer. In *City of Freeport*, the court concluded that Wheeling fire lieutenants did not possess statutory authority to direct subordinates because

"any direction which the lieutenants give to firefighters at a fire scene is derived from their superior skill, experience and technical expertise and therefore does not require the use of independent

---

conclusion that they have greater skill and experience. That is why an employer gives them such authority. The ALJ's conclusion that the Hospital assigns highly paid Attendings to spend from 80% to 90% percent of their time overseeing, training, and instructing residents-in-training but does not confer supervisory authority upon them in the Hospital's interest is counter to the record and is untenable. The conclusion urged, that Attendings merely function as professionals training other professionals, ignores the express purposes, directives and raison d'etre of a Hospital—to provide quality care to its patients through its Attendings-residents staff.

The record also shows that supervision is an ongoing daily process that typically starts during what is called "morning report" and continues throughout the day on the inpatient wards, in the operating rooms, and in the outpatient clinics. During this time residents collect patient histories, examine patients and propose treatment plans. Attendings review patient histories and examinations by residents and oversee the residents as they perform these functions. The evidence reveals that Attendings make countless changes in the treatment plans proposed by the residents, utilizing sophisticated independent judgment due to the complexity of the practice of medicine, the life-and-death nature of the decisions, and because residents are not yet qualified to make these judgments and decisions.

judgment 'in the interest of the employer' as required by the statute." *City of Freeport*, 135 Ill. 2d at 532.

The role of fire lieutenants at a fire scene, as described by the *City of Freeport* opinion, was as follows:

"The first engine company officer to arrive at the scene, normally a lieutenant, is in command. The engine company officer determines and directs a plan for extinguishing a fire. The lieutenant and firefighters then work together to extinguish the fire. 'Still alarms' (fires that do not involve buildings) account for approximately 70% of the fires. At these fires, the lieutenant and a pipeman apply a stream of water onto the fire, while the engineman operates the pump and connects a water line from the engine to a nearby water source. When a building is on fire (a 'structural alarm'), the engine company officer and pipeman enter the burning structure together pulling a hose line. The pipeman applies the water to the fire and the engine company officer helps to handle the hose." 135 Ill. 2d at 525.

As the foregoing shows, Wheeling fire lieutenants at a fire scene do not function in the same way as do Attendings at the Hospital in directing patient care, nor have they been charged with the same responsibilities as Attendings. The fire lieutenant brings to bear upon his task all his experience, specialized training and skills that he has acquired *as a firefighter*, not as a member of the employer's management team. His concern is focused upon the nature of the fire he is fighting, not his employer's management policies. See *Village of Elk Grove Village v. Illinois State Labor Relations Board*, 245 Ill. App. 3d 109, 120-21, 613 N.E.2d 311 (1993). The sole responsibility of fire lieutenants at a fire scene is, essentially, to function as a lead firefighter in extinguishing the fire, and they play an active hands-on role in extinguishing each fire.

The responsibility of Attendings at the Hospital is significantly different. Pursuant to published Hospital policies, bylaws and rules, Attendings are responsible for ensuring that the Hospital provides quality patient care, not by providing the care themselves, which they may do rarely, but through residents, who Attendings are responsible for training and developing through cumulative, hands-on case experience and elucidation, into becoming fully accredited physicians. This is done by utilizing a resident case presentation during which an Attending provides comment, teaching, criticism, direction, questioning and observation, during the course of diagnosis and treatment, concurrently with the delivery of health care to the Hospital's patients. As previously noted, Attendings' evaluations also serve as the bases for resident promotion decisions and disciplinary or reme-

dial action being taken with respect to the residents. Attendings are specifically charged with these responsibilities by the Employer.

There is no suggestion that residents meet Attendings at the Hospital by happenstance or are driven to pursuing the highly organized, sophisticated, rigorous training program merely as one professional being trained by another in the exercise of "professional/ technical discretion," as the Union insists. The Employer here does not purport simply to provide some convenient meeting place for professionals to share techniques and knowledge with other professionals; rather, the Employer, through the Hospital, pursues legislative intent by maintaining an institution where an "efficient and economical system[ ] of public health care delivery in [a] densely populated count[y]" can be provided "to the indigent in a proficient and compassionate manner." 55 ILCS 5/5—37002 (West 1994). The requisite quality patient care can be provided (and liability avoided) only through the supervision of residents by Attendings. Clearly, the direction they provide is in the Employer's interests, in pursuit of the stated legislative interest. Without the extensive supervision and oversight provided by Attendings, the record demonstrates, the Hospital could not function effectively.

The ALJ's conclusions, and the Union's contentions, as to the Employer's interest here does not fully acknowledge the Hospital's dual role as a teaching hospital and as a vehicle of providing, concurrently, quality patient care. The instruction and medical specialty programs offered there attract residents who are critical to the Hospital's ability to serve its large patient population. The programs provided in various medical specialties all have particular requirements that must be met. The maintenance of quality resident training programs is necessary to attract new residents. In performing their role as faculty, Attendings help to produce capable medical graduates and make it possible to attract more. The supervision they provide ineluctably advances the Employer's interest.

Each resident-patient interaction is an opportunity for the Attending to direct, train, assess and evaluate the resident's development, while ensuring the delivery of necessary medical attention. In contrast to the fire scene, the need for ongoing supervision, direction, and review of residents' involvement of medical care for every patient is the hallmark of a teaching hospital. The maintenance of an acute-care teaching institution is distinctly different from the mechanical and routinized task of putting out a fire; it requires the application of both the art and science of modern medicine in the management and the delivery of patient care and in the training of new doctors. In performing these tasks, the Attending is actuated not just by the

condition of the specific patient presented but also by his adherence to the Employer's interests as a member of the Employer's management team, as the Board here concluded.

Complying with the supreme court's admonition in *Chief Judge*, 153 Ill. 2d at 522, that an employee's supervisory status is fact based and should not succumb to irrelevant resemblances which lead "to compa[ring] apples to oranges," we hold that the legal prerequisites of *City of Freeport* are met in this case. The Board's conclusion that Attendings are section 3(r) supervisors is not against the manifest weight of the evidence, is not contrary to law, and must be affirmed.

Affirmed.

HOURIHANE, J., concurs.

PRESIDING JUSTICE HOFFMAN, dissenting:

In this case, we are called upon to decide whether the Illinois Local Labor Relations Board (Board) erred in determining that attending physicians employed at Cook County Hospital (Hospital) are supervisors within the meaning of section 3(r) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(r) (West 1994)). Unlike the majority, I find that whatever direction the attending physicians give to subordinates at the Hospital is derived from their superior professional skills, experience, and medical expertise and does not rise to the level of supervision within the meaning of section 3(r) of the Act. See *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 554 N.E.2d 155 (1990). I, therefore, respectfully dissent.

The majority concisely stated its reasons for affirming the Board. I believe the reasons for my dissent to be no less concise, but I am limited to five pages of published opinion to state my position. See 166 Ill. 2d R. 23 (MR No. 10343, eff. July 1, 1994). In most cases, five pages are sufficient to set forth the reasons for a dissenting opinion; however, I find that adherence to that limitation in this case would prevent me from adequately presenting my position. Rather than stating the reasons for my dissent in conclusory terms, I will publicly register my disagreement with the conclusion reached by the majority and set forth the reasons for that disagreement in the unpublished portion of this opinion.