First Division

October 26, 1998

No.
 
1-97-3162

CHICAGO TRANSIT AUTHORITY,

Petitioner-Appellant,

v.

AMALGAMATED TRANSIT UNION, LOCAL 241 and ILLINOIS LOCAL LABOR RELATIONS BOARD,

Respondents-Appellees.

)

)

)

)

)

)

)

)

)

)

Petition for Review of an Order of the Illinois Local Labor Relations Board.

Case No. L-CA-96-078

JUSTICE TULLY delivered the opinion of the court:

Petitioner, the Chicago Transit Authority, appeals a decision of the Illinois Local Labor Relations Board (Board), which found that petitioner breached its duty to bargain in good faith with the Amalgamated Transit Union, Local 241 (Union) in violation of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 
et seq.
 (West 1996)).  On February 9, 1996, the Union filed unfair labor practice charges against petitioner.  On January 14, 1997, an Administrative Law Judge (ALJ) issued a recommended decision and order which advised the dismissal of the unfair labor practice charges.  After the Union filed exceptions to certain recommendations, the Board issued its decision and order on July 21, 1997.  The Board held that petitioner violated section 10(a)(4) of the Act by failing to bargain with the Union before it implemented a job reclassification.  Petitioner appeals the Board's decision pursuant to section 11(e) of the Act (5 ILCS 315/11(e) (West 1996)) and Supreme Court Rule 335 (134 Ill. 2d R. 335).

For the reasons which follow, we affirm.

 

FACTUAL BACKGROUND

Under the Act, petitioner is a public employer, and because it is a unit of local government with a population of over one million, it falls under the Board's jurisdiction.  5 ILCS 315/3(o), 5(b) and 20(b) (West 1996).  The Union is the exclusive representative of certain of petitioner's employees, including those who are classified as Contract Clerk I and Contract Clerk II.  Petitioner and the Union were parties to a collective bargaining agreement (Agreement) which was effective beginning January 1, 1993 through December 31, 1995.  The Agreement provided that petitioner would pay wages to its union employees according to their job classification as follows:

"
3.1  BI-WEEKLY PAY
  During the term of this Agreement, [petitioner] shall, bi-weekly, pay the employees in this unit according to classification, the date of hire and length of service, the wages and salaries as shown in the attached wages and salaries lists for each contract year of the Agreement."

In addition, the Agreement provided that employees who perform the functions of a higher-graded classification were to be dual-rated, or paid at the rate of the higher-graded classification as follows:

"
4.12 TEMPORARILY ASSIGNED EMPLOYEES

Employees who are temporarily assigned to duties which require using skills for higher rated work other than those contained in their job description shall be paid at the higher rate.  If on any day an employee performs such work for more than three (3) hours the employee shall be paid at the higher rate for the entire day, provided that time and one-half the higher rate will be paid for all time worked in excess of eight (8) hours per day."

In 1995, petitioner's purchasing department was staffed with five contract clerks who provided clerical and administrative support for procurement administrators.  Procurement administrators are responsible for reviewing bids and awarding contracts for petitioner's purchase of parts, supplies, and services.  All five contract clerks had the same duties and responsibilities, and none of them had supervisory responsibilities.  The five clerks had different job titles, pay grades, and wages, however.  Grade 5 pay was higher than Grade 4 pay.  Some clerks were dual-rated, which meant that they were classified as Grade 4, but received Grade 5 pay when they performed Grade 5 duties.  Toni Shelby was a Contract Clerk I, Grade 4; Valerie Townsend, Aracelia Gaeta, and Annie Perez were classified as Contract Clerk II, Grade 4; and Rosalba Marton was a Contract Clerk II, Grade 5.  Marton was paid at a full grade 5 rate.  Townsend, Gaeta, and Perez had dual-rated pay status pursuant to section 4.12 of the Agreement and were paid at a grade 5 rate for all hours worked and received grade 4 pay for sick time, vacation, and holiday pay.  Townsend had been dual-rated since 1992, Gaeta since 1990, and Perez since 1990 or 1991.  Shelby had been a Contract Clerk I, Grade 4 in the purchasing department since August 1993.  Shelby did not have dual-rated pay status, however, and received only grade 4 pay. 

Since 1993, Shelby had been complaining to both her manager and Union executive board member that she wanted to be dual-rated.  On February 6, 1995, William Roman, petitioner's General Manager, Quality Assurance, sent a memorandum to Thomas Czech, petitioner's Vice-President, Human Resources, requesting a job study on the duties of the Contract Clerk I and Contract Clerk II positions.  Roman noted in the memorandum that Townsend, Perez, and Gaeta had been "consistently dual-rated," but Shelby had not.  According to Roman, a management review of the job descriptions for the two positions "reveal[ed] many similarities between both descriptions, as well as, some functions which are no longer valid."  He requested the job study "to accurately rate each incumbents' level of responsibility" so that petitioner could "assure equity among all incumbents."   

On February 7, 1995, Shelby filed a grievance with the Union, seeking to be dual-rated as a Contract Clerk II, Grade 5.  In the grievance, Shelby stated that "[b]oth the Contract Clerk I and Contract Clerk II job responsibilities are currently the same and have been since the restructuring of the Purchasing Department."  She also stated that "we all have the same job responsibilities."  On February 9, 1995, Williams and Shelby presented the grievance to Shelby's supervisor, Ron Tabor, who agreed with the grievance and promised to discuss it with the General Manager of Purchasing, Ed Gronkowski.  Gronkowski also agreed with the grievance and promised to submit a request to Roman to make Shelby dual-rated.  

 Meanwhile, petitioner's Human Resources Department conducted the job study.  For the study, Sameena Noetzel, an industrial organizational psychologist employed by petitioner, sent detailed questionnaires to the contract clerks.  When the clerks received the questionnaires in late February 1995, they met with Abner Williams, a member of the Union's executive board.  Williams explained that the questions were for a job study and that it could result in a reclassification of the contract clerk positions.  Noetzel analyzed the responses to the questionnaires and determined that the actual job duties performed by the five contract clerks were similar.  She submitted the redrafted job description to three other CTA industrial organizational psychologists for their assistance in determining the appropriate pay grade for the position.  Although Noetzel rated the contract clerk position a grade 5, the composite from the other psychologists resulted in a grade 4 rating.  Noetzel therefore recommended that the position receive grade 4 pay.  The general manager of personnel programs and the vice-president of human resources approved the recommendation.  Petitioner then reclassified the Contract Clerk I and II positions as a single Contract Clerk classification, removed the dual-rating, and paid the positions at grade 4.  All of the Contract Clerks  lost their dual-rated status and their grade 5 pay.

On August 9, 1995, Czech sent a letter to Isiah Thomas, the Union's president, notifying him that petitioner decided to combine the Contract Clerk I and II positions into the single classification of Contract Clerk, Grade 4, and to eliminate the dual-rating.  Czech stated that despite the reclassification, "Ms. Marton, currently assigned a grade 5, will retain this grade level."  He further stated, "[s]hould you have any questions concerning this matter, please contact Mr. Grant Ward, General Manager, Industrial relations."  No one responded to Czech's letter, and petitioner discontinued its payment of grade 5 wages to the four grade 4 clerks at the end of the next pay period, which was on or about August 19, 1995.  

On February 9, 1996, the Union filed its unfair labor practice charge with the Board.  The Board, on September 10, 1996, issued a complaint alleging in part that petitioner failed to bargain in good faith with the Union regarding the Contract Clerk reclassification.  On March 19, 1997, the ALJ issued a recommended decision and order finding that petitioner did not violate the Act and recommended that the complaint be dismissed.  The Union filed exceptions to the recommendation, and on June 4, 1997, the Board rejected the ALJ's recommendation.  

In its July 21, 1997 decision and order, the Board concluded that petitioner did not violate section 10(a)(4) of the Act by failing to bargain with the Union over the reclassification of the Contract Clerk positions.  Applying the balancing test set forth in 
Central City Education Association, IEA/NEA v. Illinois Educational Labor Relations Board
, 149 Ill. 2d 496, 599 N.E.2d 892 (1992), the Board found that petitioner's decision to consolidate the Contract Clerk I and II titles into a single Contract Clerk position was not a mandatory subject of bargaining.  The Board decided that the reclassification was not a mandatory subject of bargaining because: (1) the reclassification was a matter of wages, hours and terms and conditions of employment, and (2) a matter of inherent managerial authority, but (3) the benefits of bargaining did not outweigh the burdens on the CTA's authority.  According to the Board, "as a result of the job audit, CTA learned that, based on revisions that had taken place in the employees' actual job duties over the years, the existence of two separate Contract Clerk titles was no longer warranted."  It found that the Union "presented no evidence or legal argument to demonstrate that the benefits of bargaining over the particular reclassification decision involved herein outweighed the burdens that bargaining would impose on CTA's authority to administer its position classification system."  Therefore, it found that petitioner was not obligated to bargain over the reclassification of the Contract Clerk positions.  

Nevertheless, relying on section 4 of the Act, the Board found that petitioner "was clearly obligated to bargain with [the Union] over the 
effects
 of that decision on the Contract Clerks' wages and other conditions of employment."  (Emphasis in original).  Citing section 4 of the Act, the Board found that even though the reclassification was a matter of inherent managerial authority, the CTA was required to bargain over the impact of the reclassification.  It found that the consolidation of the job titles eliminated the clerks' ability to earn grade 5 dual-rated pay, and that "the determination of what wage rate to assign the newly created classification was undoubtedly a matter involving the employees' 'wages, hours and terms and conditions of employment.'"  Therefore, according to the Board, the wage rates to be assigned to the new classification constituted a mandatory subject of bargaining.    

Moreover, the Board disagreed with the ALJ's conclusion that the Union "waived its right to bargain over these matters by agreeing to the temporary assignments provision in Article 4 of the parties' collective bargaining agreement."  It found that the ALJ's conclusion that petitioner was properly administering the Agreement by implementing the reclassification was "without any rational basis in fact or law."  The Board found that according to article 4.12 of the Agreement, the Union did not expressly waive its right to bargain over the effects of the reclassification decision on members of the bargaining unit.  In addition, the Board held that the CTA's decision to classify the new contract clerk position as a grade 4 position was made "without prior notice to or consultation with the Union," and that it simply announced the decision as a 
fait accompli
, rather than giving the Union the opportunity to bargain in good faith.  The Board ordered the CTA to cease and desist from refusing to bargain with the Union on several issues, "including the impact thereon of a decision to reclassify bargaining unit employees."  It also ordered the CTA to rescind the reclassification of the contract clerks "and make such employees whole for the loss of any pay or benefit resulting from the failure to negotiate over the impact of the reclassification."  The Board required the CTA to post at all places where employee notices are normally placed, "in conspicuous places for a period of 60 consecutive days" a notice from the Board.  It ordered that the notice state that the CTA violated the Act, and that the CTA pledged that it would not refuse to bargain collectively in good faith with the Union and would not interfere with the exercise by CTA employees of their rights under the Act.  The notice was further required to state that the CTA was rescinding the consolidation of the Contract Clerk I and II positions and that it would make such employees whole.  Finally, the notice was required to state that the CTA pledged to bargain with the Union over the impact of the consolidation of the two contract clerk positions.     

    

ISSUES PRESENTED FOR REVIEW

On appeal, petitioner contends that the Board erred by:  (1) holding that, pursuant to section 4 of the Act, petitioner could not implement the job reclassification without first bargaining with the Union; (2) failing to consistently apply the applicable balancing test set forth in 
Central City
; (3) holding that petitioner was required to bargain over the reclassification when the contract required that wages be paid according to the grade of work performed; and  (4) holding that petitioner failed to bargain in good faith, because the Union itself showed no interest in such bargaining after it received written notice of the reclassification.

OPINION

Petitioner contends on appeal that the Board's decision was in error.  The Board's findings and conclusions on questions of fact are deemed to be 
prima facie
 true and correct.  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 692 N.E.2d 295 (1998).  We must defer to the Board's factual conclusions and will reverse the Board's decision only if it was against the manifest weight of the evidence - only if no rational trier of fact could have reached the challenged conclusion, looking at the evidence in the light most favorable to the Board.  
Alden Nursing Center - Morrow, Inc. v. Lumpkin
, 259 Ill. App. 3d 1027, 632 N.E.2d 66 (1994).  The Board's factual determinations are contrary to the manifest weight of the evidence only "where the opposite conclusion is clearly evident."  
City of Belvidere
, 181 Ill. 2d at 204, 692 N.E.2d at 301.  We will not interfere with the Board's expertise and authority unless they were exercised arbitrarily and capriciously.  
Chief Judge v. American Federation of State, County and Municipal Employees
, 153 Ill. 2d 508, 607 N.E.2d 182 (1992); 
National Union of Hospital and Health Care Employees, American Federation of State, County and Municipal Employees, AFL-CIO v. The County of Cook
, 295 Ill. App. 3d 1012, 692 N.E.2d 1253 (1998).  In examining the Board's factual findings, we will not reweigh the evidence or substitute our judgment for that of the Board.  
City of Belvidere
, 181 Ill. 2d at 204, 692 N.E.2d at 301.  In contrast, we review the Board's conclusions on questions of law 
de novo.  City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  We generally accord deference to the Board in its interpretations of the Act (
City of Burbank v. Illinois State Labor Relations Board
, 128 Ill. 2d 335, 538 N.E.2d 1146 (1989); see 
Sandburg Faculty Ass'n, IEA-NEA v. Illinois Educational Labor Relations Board, 
248 Ill. App. 3d 1028, 1034, 618 N.E.2d 989, 993 (1993) (Board's finding on a question of law is not binding on reviewing court)), however, because courts appreciate that the Board can make informed judgements based on its experience and expertise (
Davis v. The Human Rights Comm'n
, 286 Ill. App. 3d 508, 676 N.E.2d 315 (1997)).  The Board's interpretation of the Act should be overturned only if it was clearly erroneous (
County of Cook v. Illinois Local Labor Relations Board
, 266 Ill. App. 3d 53, 639 N.E.2d 187 (1994)) or constituted an abuse of discretion (
Forest Preserve District v. Illinois Local Labor Relations Board
, 190 Ill. App. 3d 283, 546 N.E.2d 675 (1989)).  Therefore, where a mixed question of fact and law is presented, the applicable standard of review should be "between a manifest weight of the evidence standard and a 
de novo
 standard so as to provide some deference to the Board's experience and expertise."  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  Our supreme court has held that for such a mixed question of fact and law a clearly erroneous standard of review is appropriate.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302, citing T. O'Neill & S. Brody, 
Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341
, 83 Ill. B.J. 512 (1995). 

Petitioner first argues that the Board erred in holding that, pursuant to section 4 of the Act, petitioner could not implement the job reclassification without first bargaining with the Union, and that it erred by failing to consistently apply the applicable 
Central City
 balancing test.  The Board first applied the three-part test for determining whether a matter is a mandatory subject of bargaining, as set forth in 
Central City
.  Under 
Central City
, if the matter is not one of "wages, hours and terms and conditions of employment," then the employer is under no duty to bargain.  If it is, then the second question is whether the matter is also one of inherent managerial authority.  If it is not, then the matter is a mandatory subject of bargaining.  If it is also a matter of inherent managerial authority, then the trier of fact "should balance the benefits that bargaining will have on the decisionmaking process with the burdens that bargaining imposes on the employer's authority."  
Central City
, 149 Ill. 2d at 523-24, 599 N.E.2d at 904-05; 
City of Belvidere
, 181 Ill. 2d 191, 692 N.E.2d 295.  "Which issues are mandatory, and which are not, will be very fact-specific questions."  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 904.       

Under section 7 of the Act, petitioner is required "to negotiate over any matter with respect to wages, hours and other conditions of employment," unless bargaining over such issues is excluded by section 4 of the Act.  5 ILCS 315/7 (West 1996).  Section 4 states in pertinent part that "[e]mployers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion as the function of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees."  5 ILCS 315/4 (West 1996).  Section 4 further states that petitioner is required to bargain collectively regarding "policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives."  

According to petitioner, it was not required to bargain over the effects of the reclassification because it had "inherent managerial authority under section 4 of the Act [(5 ILCS 315/4 (West 1996))] to correct an erroneous overpayment of wages when that correction did not change the wages, terms or conditions of employment to which the clerks were entitled under the Contract."  We note that petitioner's argument that it was merely correcting overpayments to the employees designated as Contract Clerk I, made for the first time on appeal, is waived.  See 
Metz v. Illinois State Labor Relations Board
, 231 Ill. App. 3d 1079, 596 N.E.2d 855 (1992).  

We find no error in the Board's application of the 
Central City
 test or in its application of section 4 of the Act.  In applying the test, the Board found that the job reclassification itself was not a mandatory subject of bargaining.  Even though it found that the reclassification was a matter of wages, hours and terms and conditions of employment as well as a matter of inherent managerial authority, it found that the burdens of bargaining outweighed the benefits.  The Board then correctly applied section 4 of the act, which states that an employer is required to bargain over even policy matters which directly affect wages, hours and terms and conditions of employment in addition to their impact.  The job reclassification had an impact on the wage rates for the new position and resulted in the removal of the dual-rating system.  Petitioner provides no persuasive support for its argument that the Board failed to apply the 
Central City
 test again to the question of bargaining over the effects of the job reclassification.  The Board properly applied the 
Central City
 test and section 4 of the Act, which are not in conflict.  
Cf. American Federation of State, County and Municipal Employees, AFL-CIO v. The Illinois State Labor Relations Board
, 190 Ill. App. 3d 259, 268-69, 546 N.E.2d 687, 693-94 (1989) ("Regardless of whether [employer] must bargain on the topic of introducing a drug policy, however, it must still negotiate 'with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon.'").  Furthermore, we are persuaded by the Board's argument that even if it had applied the 
Central City
 test to the issue of bargaining over the effects of the reclassification, the result would not have changed because under the third part of the test, the benefits of bargaining over the new wage rates and removal of the dual-rating system would have outweighed the burdens to petitioner.

Petitioner next contends that the Board erred in holding that petitioner was required to bargain over the reclassification when the contract required that wages be paid according to the grade of work performed.  According to petitioner, the Union had waived its right to bargain over the wage issue because it had already been resolved by sections 3.1 and 4.12 of the collective bargaining agreement.  We disagree.  "[A] party to a collective bargaining agreement may waive its rights to bargain under [the Act] where the contractual language evinces an unequivocal intent to relinquish such rights."  
American Federation of State, County and Municipal Employees v. Illinois State Labor Relations Board
, 274 Ill. App. 3d 327, 334, 653 N.E.2d 1357, 1362 (1995).  "'Evidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable.'"  
American Federation
, 274 Ill. App. 3d at 334, 653 N.E.2d at 1362.  Our review of sections 3.1 and 4.12 of the agreement shows that they do not specifically address the effects of the job reclassification decision and do not evince the Union's unequivocal intent to relinquish their rights to bargain over such effects.

Finally, petitioner argues that the Board erred in holding that petitioner failed to bargain in good faith, because the Union itself showed no interest in such bargaining after it received written notice of the reclassification.  Again, we disagree.  Our review of the record shows that the August 9, 1995 letter did not constitute an invitation to bargain, but rather simply announced the job reclassification and changes in wage rates.  Although the letter stated that petitioner would address questions, it presented the matter as a 
fait accompli.

In sum, we find that the Board properly applied the 
Central City
 test and section 4 of the Act, that the Union did not waive its right to bargain over the effects of the job reclassification, and that petitioner's August 9, 1995 letter did not constitute an invitation to bargain over those effects.  Accordingly, we affirm the decision and order of the Illinois Local Labor Relations Board.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.